652

STATE OF CONNECTICUT *v.* ADAM JOHN
(13056)

STATE OF CONNECTICUT *v.* ERICH SEEBECK
(13057)

HEALEY, SHEA, CALLAHAN, GLASS and HULL, Js.

Argued December 9, 1988—decision released April 11, 1989

*A. A. Washton,* with whom was *Peter W. Rotella,* for the appellant in the first case (defendant Adam John).

*Martin Zeldis,* assistant public defender, with whom, on the brief, were *Joette Katz,* public defender, and *Kent Drager,* assistant public defender, for the appellant in the second case (defendant Erich Seebeck).

*Kevin T. Kane,* assistant state's attorney, with whom were *C. Robert Satti, Sr.,* state's attorney, and *Kevin M. Greco,* certified legal intern, for the appellee in both cases (state).

SHEA, J. The defendants, Adam John and Erich Seebeck, were charged by informations with having committed the crimes of murder, in violation of General Statutes § 53a-54a,[1] felony murder, in violation of General Statutes § 53a-54c,[2] and larceny in the second degree, in violation of General Statutes § 53a-123 (a) (1),[3] in connection with the June, 1980 death of Ponte Patterson. After a joint jury trial, the defendant John was acquitted on the intentional murder count but was convicted of felony murder and of larceny in the second degree. The defendant Seebeck was convicted of manslaughter in the first degree, in violation of General Statutes § 53a-55,[4] as a lesser offense included in the murder count and was also convicted of felony murder and of larceny in the second degree.

---

[1] General Statutes § 53a-54a provides in part: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . . "

[2] General Statutes § 53a-54c provides in part: "A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery . . . and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants . . . . "

[3] General Statutes (Rev. to 1979) § 53a-123 (a) (1) provides that "[a] person is guilty of larceny in the second degree when: (1) The property consists of a motor vehicle."

[4] "[General Statutes (Rev. to 1979)] Sec. 53a-55. MANSLAUGHTER IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person; or (2) with intent to cause the death of another person, he causes the death of such person or of a third person under circumstances which do not constitute murder because he acts under the influence of extreme emotional disturbance, as provided in subsection (a) of section 53a-54a, except that the fact that homicide was committed under the influence of extreme emotional disturbance constitutes a mitigating circumstance reducing murder to manslaughter in the first degree and need not be proved in any prosecution initiated under this subsection; or (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person.

"(b) Manslaughter in the first degree is a class B felony."

On appeal, both defendants claim that the trial court erred in: (1) failing to grant their motions for judgment of acquittal when there was insufficient evidence to find them guilty; (2) admitting the testimony of Michael Adams at the probable cause hearing and in finding probable cause; (3) admitting the expert testimony of a forensic entomologist to establish the time of the victim's death; (4) admitting at trial the testimony of Michael Adams concerning admissions made by the defendants; (5) sealing and withholding from the defendants portions of certain police reports; (6) failing to dismiss the informations against them because of pre-arrest delay; and (7) instructing the jury on alternative forms of committing the offenses charged for which there was insufficient evidence and failing to instruct upon the necessity of unanimity for the chosen alternative.

The defendant John further claims that the trial court erred in admitting the testimony of Morris Frost concerning statements made by the defendant Seebeck. The defendant Seebeck makes the additional claims that the trial court erred in: (1) sentencing him for both felony murder and manslaughter; (2) admitting the testimony of John Ressler at the probable cause hearing regarding statements about the victim made by the defendant John; and (3) allowing the prosecutor to make ex parte remarks to the court regarding the sealing and withholding of portions of a certain police report.

After the defendants had filed their briefs in the instant appeal, they moved for a new trial upon learning that the trial court had not viewed in its entirety one of the police reports in determining whether some portions were exculpatory. The trial court denied their motions for a new trial. The court concluded that the failure of the state to present these portions of the report at trial was inadvertent and did not constitute

prejudicial prosecutorial misconduct, and that, in any event, the portions that were withheld were not exculpatory. Thereafter, the defendants filed amended appeals, in which they claim that: (1) the withholding of the full police report by the state constituted prejudicial prosecutorial misconduct; and (2) the trial court erred in denying the defendants' motions for a new trial based upon its ruling that the withheld portions of the report were not exculpatory.

With respect to the appeal and amended appeal of the defendant John, we find no error. With respect to the appeal and amended appeal of the defendant Seebeck, we find error in the sentencing of the defendant on the manslaughter charge and no error on the other claims. Accordingly, we remand the case to the trial court with direction to vacate the judgment of conviction with regard to the manslaughter charge and render judgment as on file except as modified by this opinion.

The jury reasonably could have found the following facts. During the late morning of Wednesday, June 18, 1980, the defendants visited the home of Morris Frost, an acquaintance. While the three were sitting at Frost's kitchen table, Seebeck stated that he had been arrested that morning and that he was going to leave the state. Seebeck told Frost that he knew where he could "get a car from a seventy year old queer in Waterford."

On Thursday, June 19, 1980, Ponte Patterson, the victim, picked up his dog from a veterinarian clinic. The next morning, on Friday, June 20, 1980, at about 10 a.m., Patterson phoned the veterinarian to discuss the condition and treatment of his dog. At noon on that Friday, M, Patterson's friend, phoned Patterson at Patterson's home in Waterford. The two spoke briefly, at which time Patterson told M that he could not speak with him at that time, and that he would call back M

in one half hour. When Patterson did not return the phone call, M phoned Patterson at 12:30 p.m. and again at 12:45 p.m., getting no answer each time. M phoned Patterson on Saturday and Sunday as well, still getting no answer.

Early Friday afternoon, on June 20, 1980, the defendants arrived at the home of Seebeck's parents in Oakdale. Prior to this visit, Seebeck, who did not live with his parents, had seen his parents infrequently. Seebeck informed his parents that he was leaving the state to "get his head on straight." The defendants left the house, crossed the street, and drove away in an old green automobile.

At 5:15 p.m. on that Friday, a green 1965 Buick was found abandoned and out of gas on the shoulder of the westbound lane of Interstate 84 in Brewster, New York. Brewster is a two and one-half hour drive from Waterford. The car was registered to Ponte Patterson; it had not been reported stolen. The defendants' fingerprints were found inside the car, Seebeck's on the driver's side and John's on the front passenger's side.

After abandoning the car in Brewster, the defendants continued westward. On June 21, 1980, John called his mother from Bloomsburg, Pennsylvania, and on June 22, 1980, he called his father from the same location. On Tuesday, June 24, 1980, between 2 p.m. and 3 p.m., Michael Adams, who was traveling on the Ohio Turnpike, picked up the defendants, who were hitchhiking, in Sandusky, Ohio, and drove them to Andalusia, Illinois. The defendants had no money and had with them only the clothes that they were wearing and two or three blankets. The defendants rode with Adams for seven hours, during which time Seebeck sat in the front passenger seat and John sat in the middle of the back seat.

During the course of the trip, Adams asked the defendants how they had gotten as far as Ohio. One of the defendants responded that they had gotten a car from an old man who lived out in the woods, that they had run out of gas in New York, and that they had hitchhiked from New York to Ohio. When asked by Adams whether the car had been stolen, John responded that the car was not stolen, because "the guy that owned it was dead." Seebeck did not respond to this statement. Adams then asked them how the owner of the car had died. Seebeck answered that he had died "of old age or something." Adams asked the defendants whether anyone else knew that the owner of the car was dead, to which question neither defendant responded.

On the same Tuesday morning, June 24, 1980, the body of Ponte Patterson, a seventy year old man, was found by two of his cousins in the backyard of his house, located in a wooded area in Waterford. One of them contacted the police, who arrived at Patterson's house at about 10 a.m.

Examination of the area in front of the victim's house revealed that a struggle apparently had taken place there, because the victim's hat, bow tie and camera were strewn about. Near the front door, the police found an area of matted down grass on which there was a bloodstained brick, and from that area, there were drag marks along the right side of the house to the rear corner where the body was found. The victim's body and his clothing were in a position that indicated that he had been dragged by his feet. The victim's right front pants pocket, in which he ordinarily kept his keys, was inside out and empty. No keys to his car or house were found at the scene, inside the house, or on his person, and the victim's car was missing. Several bloodstained bricks were found on the ground near the victim's head.

In the front yard, in the area where the struggle had occurred, the police found a bent copper bracelet, which looked "just like" a copper bracelet that a friend of Seebeck's had given back to Seebeck several weeks earlier. In the victim's mailbox, across the street from his house, the police found mail that had been delivered on Friday, June 20, between 2 and 2:30 p.m., and was still in the box on June 24, even though Patterson usually picked up his mail from the box every day.

An autopsy revealed that the victim had suffered extensive injuries to the head, a fractured skull, a broken right arm, a dislocated wrist, four stab wounds in the back, and six fractured ribs. The cause of death was a depressed skull fracture with laceration of the brain, caused by an object such as the corner of a brick. There was considerable maggot activity on the victim's head and body.

Stephen Adams, an assistant medical examiner, went to the scene to investigate the circumstances of the victim's death. On the basis of his observations of the victim's body, the yard, and surrounding locations, Adams concluded that Patterson had died two to four days before his body was discovered on June 24. Catherine Galvin, the acting chief medical examiner, who had performed the autopsy, examined photographs of the victim's body taken at the scene, inspected temperature records and viewed the actual scene. She concluded that within reasonable medical probability, the time span between the victim's death and the delivery of his body to the medical examiner's office on June 24 was between two and four days. Wayne Lord, a forensic entomologist who had been consulted by the office of the chief medical examiner, concluded that the victim's death occurred sometime between the late afternoon of June 19 and the early afternoon of June 21.

I

The defendants claim that the trial court erred in denying their motions for judgment of acquittal. "When a verdict is challenged because of insufficient evidence, the issue is whether ' " 'the jury could have reasonably concluded, upon the facts established and the inferences reasonably drawn therefrom, that the cumulative effect of the evidence established guilt beyond a reasonable doubt.' " ' " *State* v. *Avis,* 209 Conn. 290, 308–309, 551 A.2d 26 (1988). " ' " 'The evidence must be given a construction most favorable to sustaining the jury's verdict.' . . . " ' " (Citations omitted.) *State* v. *Snook,* 210 Conn. 244, 259, 555 A.2d 390 (1989). " ' " 'In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct.' " ' " *State* v. *Avis,* supra, 309.

John contends that the evidence against him was insufficient to support the jury's guilty verdict as to the felony murder charge.[5] Seebeck contends that the evidence against him was insufficient to support the jury's guilty verdicts as to the felony murder and manslaughter charges. Both defendants challenge in particular the sufficiency of the evidence that established the victim's time of death. The defendants claim that the "uncontradicted evidence" indicated that the victim was alive at a time after they had left Connecticut, and that a rational jury, having viewed this evidence, could not have concluded that they were guilty beyond a reasonable doubt. We are not persuaded.

The defendants presented several witnesses who testified that they had seen the victim alive after Friday,

---

[5] In his brief, John makes no argument that the evidence was insufficient to support the larceny conviction.

June 20, 1980. The jury, however, as the sole judge of the credibility of witnesses, was entitled to reject this testimony if it did not find it credible. *State* v. *Dudla,* 190 Conn. 1, 7, 458 A.2d 682 (1983). Further, this testimony was not uncontradicted. The state not only demonstrated inconsistencies in the testimony of these witnesses, but also presented considerable evidence relating to the time of death. The state's evidence was sufficient to support the jury's finding in this case and included the following testimony. M said that he had spoken with the victim shortly before noon on June 20, 1980. The victim did not call back in thirty minutes as promised and did not answer his phone when M called back at 12:30 p.m. and 12:45 p.m. on that date. The victim did not answer the phone when others called him from June 21 to June 24. The victim's June 20 mail, which was delivered between 2 and 2:30 p.m. on that day, was still in the victim's mailbox on June 24, even though the victim customarily removed his mail every day. The medical examiner estimated that the victim had died between June 20 and June 22 and Wayne Lord, a forensic entomologist, testified that the victim most likely died during the late morning or early afternoon of Friday, June 20, 1980.

The state also presented evidence to prove that the victim's car had been found abandoned at 5 p.m. on June 20, in a location two and one-half hours from Waterford, with the defendants' fingerprints inside the car. The state proved that when the defendants were with Michael Adams, before the discovery of Patterson's body was generally known, they were aware that the owner, an "old man who lived in the woods," was dead. On the basis of this evidence and the reasonable inferences drawn therefrom, the jury could have concluded that the victim was killed at about noon on June 20, 1980, that his car was stolen shortly after he was killed, and that the only way the defendants could

have known of the victim's death was through their participation in the homicide of the victim, the theft of his car, and their immediate flight from the state in that car. Although the evidence against the defendants was in part circumstantial, the jury could nonetheless have found that the defendants were guilty beyond a reasonable doubt. The trial court, therefore, did not err in denying the defendants' motions for judgment of acquittal.

## II

In addition to their claims of insufficiency of the evidence presented at trial, each defendant claims that at the probable cause hearing held pursuant to General Statutes § 54-46a certain evidence on which the court, *Edelberg, J.*, may have relied in finding probable cause was improperly admitted and that, without such evidence, no such finding would or could have been made. The evidence that the defendants claim should have been excluded is the testimony of Michael Adams concerning the admissions made by one or both defendants while riding in his car, indicating their knowledge of the death of the victim as well as their involvement in the theft of the car. They claim that at the probable cause hearing it was not clear to which of the two defendants Adams ascribed these admissions. The defendant Seebeck has raised an additional claim that the testimony of John Ressler[6] that the defendant John had told him how the murder had occurred was inadmissible for the purpose of determining probable cause in his case.

No objection to any of this evidence was raised at the probable cause hearing nor was a claim of any infirmity in the finding of probable cause raised at any stage of the proceedings in the trial court. "The supreme

---

[6] John Ressler did not testify at trial.

court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial." Practice Book § 4185. The defendants claim, however, that the use of the evidence involved violated their constitutional rights of confrontation because, since neither defendant testified, there was no opportunity for cross-examination of the declarant concerning the statements admitted. See *Bruton* v. *United States,* 391 U.S. 123, 128, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968). Thus, they seek review of this claimed error under the second exceptional circumstance recognized in *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973), as warranting review of claims not raised in the trial court, "where the record adequately supports a claim that a litigant has clearly been deprived of a fundamental constitutional right and a fair trial."

We are not inclined to regard every claim of a violation of the hearsay rule that arguably implicates the right of confrontation as necessarily rising to the level of a constitutional claim reviewable under *Evans.* Where a seasonable objection is raised to hearsay evidence, the party offering the evidence often may be able to establish a foundation sufficient to allow its admission as an exception to the hearsay rule. This consideration is one justification for the principle that the trier may rely upon hearsay evidence admitted without objection to the extent that it has "rational probative force." See *Marshall* v. *Kleinman,* 186 Conn. 67, 72, 438 A.2d 1199 (1982); *DeGroat* v. *DeGroat,* 171 Conn. 363, 370 A.2d 963 (1976). In this case, if an objection had been made to the testimony of Adams at the hearing that it was unclear which statements were being attributed to each defendant, the state undoubtedly would have attempted to establish a sufficient foundation for admissibility, as it did at trial, when such an objection was raised.

With respect to the testimony of Ressler relating to the defendant John's admission of knowledge of some of the circumstances of the crime, it is clear that the evidence was properly admitted at the hearing for the purpose of determining probable cause against the defendant John. The defendant Seebeck's claim that the experienced jurist who conducted the probable cause hearing may also have relied upon this testimony in finding probable cause against him is refuted by the record. After completion of Ressler's direct examination, the defendant Seebeck requested that the testimony relating to John's statements not be used in deciding whether there was probable cause to prosecute Seebeck. The state agreed that John's statements to Ressler could not be used against Seebeck. The court declared that it had "no problem with that." It is quite apparent that the record does not demonstrate that either defendant "has clearly been deprived of a fundamental constitutional right and a fair trial" by the admission of evidence to which no objection was raised until this appeal. *State* v. *Evans,* supra, 70. Accordingly, we decline further review of the defendants' claims that such evidence was inadmissible.

The defendants also seek review of the sufficiency of the evidence at the probable cause hearing to support the findings of probable cause against each of them.[7] In *State* v. *Mitchell,* 200 Conn. 323, 512 A.2d 140 (1986), this court held that a finding of probable cause made pursuant to General Statutes § 54-46a,

---

[7] The state contends that the failure of the defendants to file motions to dismiss the informations, as the defendant did in *State* v. *Mitchell,* 200 Conn. 323, 335, 512 A.2d 140 (1986), bars review of their sufficiency of evidence claims. As the state concedes, however, each defendant, at the conclusion of the testimony at the probable cause hearing, did argue that the evidence as a whole was insufficient to support a finding of probable cause. No claim was then made that any of the testimony at the hearing, such as that of Michael Adams, could not be relied upon for finding probable cause. As previously mentioned, however, the parties and the court had

which had been enacted following the adoption of Amendment XVII to article first, § 8 of our Connecticut constitution, was reviewable, because "[a] judicial determination of probable cause has thus been made a constitutional prerequisite to the court's subsequent jurisdiction to hear the trial."[8] The defendant Seebeck, however, claims only that the evidence for finding probable cause was inadequate without the testimony of

---

agreed at the conclusion of John Ressler's examination, that his testimony about statements of the defendant John would not be used against the defendant Seebeck.

The state's claim that a motion to dismiss is essential to preserve for review a claim of insufficiency of the totality of the evidence for finding probable cause is unsound. Practice Book § 816 expressly bars a defendant "who has been indicted by a grand jury or who has been arrested pursuant to a warrant" from moving to dismiss an indictment or information under Practice Book § 815 (5), which allows such a motion for "[i]nsufficiency of evidence or cause to justify the bringing or continuing of such information or indictment or the placing of the defendant on trial." Although the references to a "grand jury" and to an indictment contained in § 816 have been obsolete since the enactment of General Statutes § 54-46a, it is undisputed that the defendants had been arrested "pursuant to a warrant." They were not, therefore, eligible under § 816 to move for a dismissal of the information for insufficiency of the evidence but could raise such a claim only at the probable cause hearing. The evident purpose of § 816 was to avoid the delay involved in repeated challenges to the existence of probable cause once that determination had been made by a grand jury or by a judge issuing an arrest warrant.

[8] We agree with the state that our reference in State v. Mitchell, 200 Conn. 323, 330, 512 A.2d 140 (1986), to a determination of probable cause as a prerequisite to "subsequent jurisdiction to hear the trial" pertains, not to subject matter jurisdiction, but only to jurisdiction over the person of the defendant. General Statutes § 54-46a (a) expressly allows the waiver of a preliminary hearing to determine probable cause, so it obviously cannot be essential for subject matter jurisdiction. Accordingly, like other defects relating to jurisdiction of the person, any infirmity in the evidence presented at a probable cause hearing is deemed to be waived if not seasonably raised. State v. Baez, 194 Conn. 612, 615–16, 484 A.2d 236 (1984); State v. Gallagher, 191 Conn. 433, 438, 465 A.2d 323 (1983). The defendants are therefore mistaken in relying upon our reference in Mitchell to "jurisdiction to hear the trial" as supporting review of claims not asserted in the trial court because any deficiency at the hearing on probable cause would implicate subject matter jurisdiction.

Adams and Ressler. Since we have concluded that the Adams testimony was properly before the court at the probable cause hearing and that the Ressler testimony was not relied upon by the court in finding probable cause against Seebeck, we need not review this claim further.

The defendant John claims that, even if the testimony of Adams can be used to support the probable cause finding, the totality of the evidence was insufficient to support the murder and felony murder charges against him. In addition to the Adams testimony, however, the Ressler testimony that John had described how the victim had been stabbed and struck in the head with a brick could properly have been used in finding probable cause against John. This evidence of details of the crime known only to an eyewitness, together with the undisputed strength of the evidence of John's participation in the car theft, was sufficient to support the finding of probable cause against him. We conclude that the finding of probable cause against each defendant was adequately supported by the evidence presented at the hearing.

## III

The defendants claim that the trial court erred in failing to disclose at trial certain portions of statements made to the police by B and M relating to their associations with the victim. With respect to B, who did not testify at trial, the defendants contend that the undisclosed information, which was made available to counsel for the purpose of this appeal, would have provided a reason for further investigation of his relationship to the victim and this might have led to the discovery of exculpatory evidence. With respect to M, who did testify as a witness for the state, they maintain that the undisclosed part of his statement might not only have resulted in the discovery of exculpatory

information on further investigation but also could have been used in attacking M's credibility on cross-examination. We are not persuaded that the non-disclosure in either instance resulted in any prejudice to the defendants.

## A

More than one year before trial the state disclosed to the defendants, as exculpatory evidence, a statement made by B to a police officer that at about 3:30 p.m. on the day the state claimed the murder had occurred, June 20, 1980, B had given the victim, with whom he was previously acquainted, a ride to an intersection near the victim's home. The state also informed them that in later interviews with the police B had indicated that he was uncertain of the date when he gave a ride to the victim. At trial B came to court as a possible witness for the defendants, but was never called upon to testify. A police officer testified, however, without objection, as to the content of B's statement relating to his driving the victim toward his home at about the time the murder was claimed to have occurred. During this testimony the court ordered that the portions of the police report containing this statement be marked as an exhibit for identification and made available to the defendants. The remainder of the report, which contained no exculpatory information in the view of the court, was not disclosed, however, and was sealed. It was made available to the defendants after the trial for the purpose of the appeals.

The portion of the report that the defendants were not permitted to see at the trial contained a statement of B that he knew of the victim's homosexual tendencies and that he recalled an occasion about one year before when the victim had made a sexual advance toward him. B also told the police investigator that "nothing came of these advances and he and the vic-

tim had remained friends." During this interview a color photograph of B in ordinary attire found by the police in the victim's house was shown to B, who recalled that it was probably taken about one month before the date of the homicide.

After the defendants had filed their main briefs in these appeals, it was discovered that an additional part of the police report concerning B had not been disclosed to the trial court, even though the state had purported to deliver the entire record of police interviews with B for examination by the court before it ruled on what portions should be disclosed. In the part omitted, B told of an incident that had occurred during the month preceding the murder in which the victim had arranged for B to have a "sexual encounter" with a married woman at the victim's home. This discovery became the basis for motions for a new trial filed by the defendants, which were heard by the same judge who had presided at the trial. He denied the motions, finding that the state's failure to have delivered the entire report during the trial had been inadvertent. He also concluded that, if the missing part of the report had been presented at the time of the ruling on disclosure, it would not have been made available to the defendants because it contained no exculpatory material.[9]

---

[9] The defendants focus upon the failure of the state to deliver the entire police report concerning B for examination by the trial court in deciding what information therein should be disclosed as an instance of prosecutorial misconduct. Although the court in denying the motion for a new trial found this lapse to have been inadvertent, the failure of the prosecution to disclose exculpatory material need not be purposeful. "[T]he suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady* v. *Maryland,* 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Our ultimate conclusion that the undisclosed portion of the police report contained no exculpatory matter, however, removes any basis for regarding the state's negligence in failing to turn over the entire police report as prosecutorial misconduct.

Since the advent of *Brady* v. *Maryland,* 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), it has been clear that a prosecutor is under a duty to disclose to a defendant any evidence he possesses that is both favorable to the accused and material to guilt or punishment. "[T]he prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." *United States* v. *Bagley,* 473 U.S. 667, 675, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985). In *Bagley,* the United States Supreme Court reformulated the test for determining whether a prosecutorial failure to disclose evidence favorable to an accused is material, as follows: "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Id., 682. This standard was held to be applicable whether or not the defendant had made a specific request for the undisclosed evidence, a general request, or even no request. Id.; see *United States* v. *Agurs,* 427 U.S. 97, 107, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976). This court has followed the *Bagley* standard of materiality since its formulation. *State* v. *Pollitt,* 205 Conn. 132, 149, 531 A.2d 125 (1987).

The defendants have not demonstrated nor can we conceive of any way in which the portions of the police report concerning B that were not disclosed at trial can reasonably be said to contain evidence favorable to the defendants and so material to their guilt as "to undermine confidence in the outcome." *United States* v. *Bagley,* supra, 682. Since B did not testify at the trial, despite his availability, the undisclosed information, being hearsay, could not have been used for any purpose at trial, even if it were otherwise admissible. Fur-

thermore, the defendants had no reason to attempt to discredit B, because his statement indicating that the victim had not been killed until sometime after 3:30 p.m. on June 20, 1980, supported their alibi that they had left Connecticut in the car they stole from the victim prior to his death. The defendants argue, nevertheless, that, if they had obtained the missing information earlier, they might, through further investigation, have discovered evidence pointing to B as the offender sufficient to raise a reasonable doubt as to their guilt. In support of their claim that the undisclosed portions of the report implicated B as a suspect, the defendants refer to B's admissions that his photograph found in the victim's home had been taken within one month before the date of the murder, that the victim had made homosexual advances to him, and that the victim had arranged for him to engage in a sexual relationship with a married woman. They maintain that this evidence of possible motivation on the part of B to kill the victim, together with his statement to the police that he had given the victim a ride at 3:30 p.m. on June 20, 1980, making B the last person to have admitted seeing the victim alive, was sufficient to have affected the outcome of the trial.

We agree with the trial court that none of the evidence kept from the defendants at the trial was sufficiently relevant to have been admissible. "A defendant may give evidence concerning a third party's involvement with the crime, as long as there is some evidence which directly connects the third party with the crime." *Siemon* v. *Stoughton,* 184 Conn. 547, 555, 440 A.2d 210 (1981); *State* v. *Giguere,* 184 Conn. 400, 405, 439 A.2d 1040 (1981); *State* v. *Marshall,* 166 Conn. 593, 601, 353 A.2d 756 (1974); *State* v. *Perelli,* 125 Conn. 321, 328, 5 A.2d 705 (1939). Even if the defendants' unwarranted assumption were sound that the undisclosed evidence supports an inference of a motive for B to kill the vic-

tim, "[e]vidence of the motive of one other than the defendant to commit the crime will be excluded where there is no other proof in the case which tends to connect such other person with the offense with which the defendant is charged." *State* v. *Marshall,* supra. The defendants not only offered no such proof at trial but also failed to present such evidence at the hearing on their motions for a new trial, after they had had ample opportunity to conduct further investigation. Their speculation that such evidence might possibly have been discovered but for the failure to disclose the full police report at an earlier stage does not satisfy the *Bagley* materiality standard of undermining confidence in the outcome of the trial.

B

The remaining claim of the defendants concerning the nondisclosure of exculpatory evidence involves M, who was called as a witness for the state. He testified that he had been a friend of the victim and had made a telephone call to his house about noon on June 20, 1980, the day of the murder. The victim spoke briefly on the telephone, saying that two "kids" with a motorcycle were there visiting and that he would return the call in one half hour. When the victim failed to call back as agreed, M attempted several times that day and on the following two days to reach him by telephoning his house, but the calls were unanswered. When M learned from a news broadcast on June 24, 1980, that the victim had been killed, he called the police to inform them of his attempts to contact the victim. He was interviewed twice by the police and he believed they had regarded him as a suspect until after the second occasion when he had submitted to a lie detector test.

During M's cross-examination the defendants requested the police reports concerning him, including records of any of his statements. After an intervening

adjournment, the state's attorney delivered to the defendants copies of the reports containing the investigating officers' accounts of conversations with M on June 25, June 30, and September 30, 1980, and October 19, 1984. The state's attorney, however, had deleted from the June 30, 1980 report two paragraphs that he claimed were irrelevant and not exculpatory. The court ordered the entire report to be made a court exhibit and to be sealed, after marking the undisclosed portion separately for appellate review. The court explained that, prior to adjournment on the preceding day of trial, the state's attorney had made a request in chambers, without the presence of other counsel, that the court review the entire report to determine whether a designated portion thereof might be withheld from the defendants, as the state had intended to request when court convened. The court, after reviewing the report, had called counsel for the defendants into chambers and had informed them of the request by the state's attorney that a portion of the police report not be disclosed. The court had also declared that it "agreed with" the state's attorney.

The defendants focus first upon the conduct of the state's attorney in submitting his request for review of the reports to the trial judge in chambers in the absence of other counsel. They point out that any ex parte communication concerning a pending proceeding between a lawyer and a judge is prohibited by both the rules of professional conduct and the code of judicial conduct. Connecticut Rules of Professional Conduct, Rule 3.5; Connecticut Code of Judicial Conduct, Canon 3.A. (4). This court has held with respect to an ex parte communication between a judge and a juror that the constitutional right of an accused to a fair trial is involved and that, accordingly, the state has the burden of showing that such a communication was harmless beyond a reasonable doubt. *Aillon* v. *State,* 173

Conn. 334, 338–39, 377 A.2d 1087 (1977); *Aillon* v. *State,* 168 Conn. 541, 548, 363 A.2d 49 (1975). In *State* v. *Hackett,* 182 Conn. 511, 438 A.2d 726 (1980), where there also had been an ex parte communication between a judge and a juror, we recognized that a full and prompt disclosure in open court of what had transpired, as well as the opportunity afforded to the defendant, when informed of the circumstances, to challenge the record thus established is highly significant in satisfying the requisite standard of harmlessness.

In the present case the defendants never questioned the court's recital of the content of the ex parte communication or the surrounding circumstances nor did they seek a mistrial or other remedy. Even during the posttrial hearing on their motions for a new trial, they never attempted to supplement the trial court record in regard to the ex parte communication. From the record before us it appears that the only purpose of the state's attorney in delivering the police report to the court in chambers was to expedite the trial by affording the court an opportunity to read the document before returning to the bench. Practice Book § 753 provides that, if the prosecutor claims that a certain matter should be deleted from the statement of a witness to be produced pursuant to Practice Book § 752 after the witness has completed his direct testimony, the court shall inspect the statement in camera and "shall not disclose that portion of such statement which does not relate to the subject matter of the testimony of the witness." Because it was nearly time to adjourn when the trial judge finished reviewing the report, he did not return to the bench that day to make a formal ruling but called defense counsel into chambers to inform them of what had occurred and of his inclination not to disclose a portion of the police report. When the court next convened, defense counsel voiced their objections to the failure to disclose all of the police report before

a final ruling was made. Although we recognize the impropriety of any ex parte communication relating to a pending case, we can perceive no prejudice to the defendants that resulted from it. The failure of defense counsel to move for a mistrial or other relief because of the ex parte communication indicates that they did not believe there had been any prejudice. We are convinced that the state has sustained its burden of showing that the error was harmless beyond a reasonable doubt.

The defendants also maintain that the court erred in ruling that two paragraphs of the June 30, 1980 report should not have been disclosed. This portion of the report contained a statement of M to the officer indicating that the victim had arranged for him to engage in a "sexual encounter" with a married woman, which took place at the victim's house. M had told the officer previously that, although he was aware of the victim's homosexual tendencies, he had never been involved with him in any such activity. In mentioning the sexual encounter that the victim had arranged for him, M also informed the officer that the victim had said that, if M carried out the agreement and in fact had the sexual relationship, M would have to engage in homosexual activity with the victim.

The defendants claim that this portion of the police report should have been disclosed because (1) it contained exculpatory matter, and (2) it could have been used to discredit M as a witness. They do not contend that this portion related "to the subject matter of the testimony of the witness," the criterion for disclosure under § 753, except insofar as the credibility of a witness may be embraced within the term "subject matter" as used in the rule.

The defendants argue that an inference can be drawn from M's statement concerning the condition attached

to the "sexual encounter" the victim arranged that M did in fact engage in homosexual acts with the victim. They assume that, if such activity did occur, M might have been motivated to kill the victim and that a timely disclosure of this information would have enabled them to discover further evidence implicating M. No such evidence, however, was presented at the hearing on their motions for a new trial, despite the intervening opportunity to gather such evidence.

In considering a similar claim regarding the undisclosed statements of B to the police, we have concluded that, even if these statements might constitute evidence of motive, they would not be admissible in the absence of other proof tending to connect B with the crime. *State* v. *Marshall,* supra, 601. There is no evidence that M was any more involved in the murder of the victim than was B. It is also speculative to assume that an earlier disclosure of this information would have enabled the defendants to discover admissible evidence of M's involvement that would be helpful to them.

The defendants' claim that the undisclosed statements of M would have provided a basis for attacking his credibility on cross-examination is contrary to the rule this court approved in *State* v. *Mastropetre,* 175 Conn. 512, 519, 400 A.2d 276 (1978), that "a witness' sexual conduct does not, of itself, reflect upon his or her credibility." Although we had expressed a somewhat conflicting view in an earlier case involving misconduct of a witness by committing adultery; *Vogel* v. *Sylvester,* 148 Conn. 666, 677, 174 A.2d 122 (1961); we adhere to the rule we endorsed in *Mastropetre* that sexual conduct alone is not a sufficient basis for impeaching a witness. The defendants could not have used the evidence of sexual conduct on the part of M to cross-examine him as they presume. They were not prejudiced, therefore, by the ruling of the court denying disclosure of this portion of the report to them.

Accordingly, its nondisclosure did not affect the outcome of the trial. *United States* v. *Bagley,* supra, 682.

## IV

The state called Wayne Lord, a forensic entomologist, to testify as to the time of the victim's death. Lord examined photographs of the victim's body, which showed that the victim's body, when discovered, had heavy infestations of maggots in the facial and cranial areas. He also examined weather records from the New London airport regarding the temperature, rainfall, cloud cover and wind speed and direction for the days on and before the victim's body was discovered. Lord testified that the larvae were of the green blow fly variety, that these blow fly larvae pass through three "instars" or larval stages, and that he was able to estimate the time of the victim's death based upon the rate and stage of the maggot development. He testified further that several climatic considerations, including cloud cover and rainfall, will influence whether green blow flies deposit their eggs on a decomposing body, because such flies lay their eggs during the daylight hours when the sun is at its peak. Lord concluded that several of the maggots were mature third instar larvae, and using the weather records from the New London airport, he testified that the victim most likely died during the late morning or early afternoon of Friday, June 20, 1980.

The defendants claim that the trial court erred in admitting Lord's testimony. They claim that because Lord did not have actual specimens, but rather, relied upon photographs of the victim's body, and because his opinion was based upon allegedly inaccurate weather data, there was an insufficient and inaccurate factual basis for his opinions. We conclude, however, that the trial court did not abuse its discretion in admitting this testimony.

Whether a witness is qualified to testify as an expert with respect to a certain matter is a decision to be made by the trial court. *Oborski* v. *New Haven Gas Co.,* 151 Conn. 274, 280, 197 A.2d 73 (1964). That decision will not be disturbed on appeal unless there has been an abuse of discretion or there was a clear error involving a misconception of the law. *State* v. *Cosgrove,* 181 Conn. 562, 588, 436 A.2d 33 (1980). Once the trial court has determined that the witness has reasonable qualifications to testify as an expert on the question presented, the objection goes to the weight rather than the admissibility of the testimony. *State* v. *Wallace,* 181 Conn. 237, 241, 435 A.2d 20 (1980). It is rare for this court to find that a trial court has erred in a ruling permitting expert testimony. *Wray* v. *Fairfield Amusement Co.,* 126 Conn. 221, 224, 10 A.2d 600 (1940).

" 'In order to render an expert opinion the witness must be qualified to do so and there must be a factual basis for the opinion.' " *State* v. *Douglas,* 203 Conn. 445, 452, 525 A.2d 101 (1987), quoting *State* v. *Asherman,* 193 Conn. 695, 716, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985). Some facts must be shown as the foundation for an expert's opinion, "but there is no rule of law declaring the precise facts which must be proved before such an opinion may be received in evidence." *Waldron* v. *Raccio,* 166 Conn. 608, 614, 353 A.2d 770 (1974). Where the factual basis of an expert opinion is challenged, therefore, " 'the question before the court is whether the uncertainties in the essential facts on which the opinion is predicated are such as to make an opinion based on them without substantial value.' " *State* v. *Douglas,* supra, 452–53, quoting *State* v. *Asherman,* supra, 716–17.

Lord testified that during the three stages of development, the larvae undergo changes in their size and other physical characteristics, particularly the charac-

teristics of their mouth parts. Each stage of develop-
ment, therefore, can be recognized by the size of the
larvae and the presence of certain physical characteris-
tics. Lord testified that a meaningful opinion could be
derived from the photographs of the larvae on the vic-
tim's body, because he and other experts in the field
of entomology commonly rely on photographs such as
the ones observed by him to identify the size and charac-
teristics of the larvae and their corresponding stages
of development. The trial court was entitled to rely
upon this showing in ruling on the admissibility of
Lord's testimony, and therefore, it did not abuse its
wide discretion.[10] Further, the fact that there was con-
flicting evidence regarding the weather on the days in
question would go to the weight of Lord's opinion and
not to its admissibility. See *State* v. *Asherman,* supra,
718.

## V

Morris Frost testified at trial that while the defend-
ants were sitting at his kitchen table, the defendant
Seebeck stated that he had been arrested that morn-
ing and that he was going to leave the state. Seebeck
told Frost that he knew where he could "get a car from
a seventy year old queer in Waterford." The defend-
ant John did not participate in the discussion. The
defendant John claims that the trial court erred in
admitting Frost's testimony, because, with respect to

---

[10] The defendants claim that the trial court should have applied the *Frye*
test; *Frye* v. *United States,* 293 F. 1013 (D.C. App. 1923); to Lord's testi-
mony, because Lord did not show that reliance on autopsy photographs
to identify the developmental stages of larvae is generally accepted in the
field of forensic entomology. As noted above, however, Lord made such
a showing.

Neither defendant claims that the expert testimony of an entomologist
to establish the time of death is inadmissible per se. We note, however,
that other courts have allowed such evidence. See, e.g., *People* v. *Clark,*
6 Cal. App. 3d 658, 664, 86 Cal. Rptr. 106 (1970); *Knoppa* v. *State,* 505
S.W.2d 802, 803 (Tex. Crim. App. 1974).

his own case, Frost's testimony resulted in a *Bruton* violation and was inadmissible hearsay.

The *Bruton* rule is simply inapplicable to the statements attributed by Frost to the defendant Seebeck. In *Bruton* v. *United States,* 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968), the court found a violation of the defendant's sixth amendment right of confrontation when the confession of a nontestifying codefendant, inculpatory against the defendant Bruton, was admitted in their joint trial. This court has recognized, however, that "extrajudicial statements or confessions by one defendant [that] do not directly inculpate the codefendant are not within the prohibition of *Bruton* v. *United States,* supra, and are admissible. *Bruton* reaches only those statements [that] implicate the complaining codefendant as well as the declarant." *State* v. *Cosgrove,* 181 Conn. 562, 591, 436 A.2d 33 (1980). The trial court properly held that Seebeck's statements to Frost did not directly inculpate John, and therefore, that the *Bruton* rule was inapplicable. The fact that there was no reason for John to reply to Seebeck's statements, which John acknowledges, is an implicit recognition of the noninculpatory nature of the statements as to him.

The defendant John claims also that, as to him, Seebeck's statements were inadmissible hearsay. John claims that because there was no reason for him to reply to Seebeck's statements, such statements could not be used against him as an admission. We reject the defendant's contention for two reasons. First, it is manifest that the statements were not offered as an admission of John, but rather, "to indicate that [John] was present when a conversation occurred." Whether John had reason to reply to these statements, therefore, is irrelevant to this inquiry. Second, and more fundamentally, we need not decide whether the ground for admissibility articulated below was correct, because this court

is free to sustain a ruling on a different basis from that relied upon by the trial court. See *State* v. *Vincent,* 194 Conn. 198, 204 n.8, 479 A.2d 237 (1984); *Favorite* v. *Miller,* 176 Conn. 310, 317, 407 A.2d 974 (1978); W. Maltbie, Connecticut Appellate Procedure (2d Ed. 1957) § 36. We conclude that the statements were admissible to show their effect on John and to explain his subsequent conduct.

It is an elementary premise of evidentiary law that a statement made out of court that is offered to establish the truth of the facts contained in the statement is hearsay. *State* v. *Silveira,* 198 Conn. 454, 473, 503 A.2d 599 (1986); *State* v. *Sharpe,* 195 Conn. 651, 661, 491 A.2d 345 (1985); C. Tait & J. LaPlante, Handbook of Connecticut Evidence (2d Ed. 1988) § 11.1.1. A statement that is offered to show its effect upon the hearer, however, is not hearsay. *State* v. *Hull,* 210 Conn. 481, 499, 556 A.2d 154 (1989); *State* v. *Silveira,* supra; *State* v. *Zdanis,* 173 Conn. 189, 192 n.1, 377 A.2d 275 (1977). In the present case, the statements show John's awareness of Seebeck's intention to leave the state and his awareness of the method by which Seebeck intended to do so. Once the state had demonstrated this awareness, John could hardly have claimed thereafter that he was simply along for the ride, nor could he have claimed that, despite his presence in the stolen car, he was unaware of how it had been obtained. Because Frost's testimony was not hearsay and was relevant to explain John's subsequent conduct, the trial court properly admitted the evidence.

## VI

The defendants next claim that the trial court erred in admitting Michael Adams's testimony regarding statements made by the defendants during the trip from Ohio to Illinois. During the course of the trip, Adams asked the defendants how they had gotten from

Connecticut to Ohio. One of the defendants responded that they had gotten a car from an old man who lived out in the woods, that they had run out of gas in New York, and that they had hitchhiked from New York to Ohio. Adams testified that, when he asked whether the car had been stolen, John stated that the car was not stolen, because "the guy that owned it was dead." Adams asked the defendants how the owner of the car had died. Adams testified that Seebeck answered that the owner had died "of old age or something, he was a senile old man." Adams asked the defendants whether anyone else knew that the owner of the car was dead, to which question neither defendant responded.

The defendants launch several attacks on the admissibility of Adams's testimony. The defendant John claims that the attribution of certain statements to him varied from the offer of proof, and therefore, such statements should have been excluded. He claims further that the statements that were attributed to Seebeck or to neither of the defendants did not fall within any of the recognized hearsay exceptions, and therefore, admission of these statements violated the confrontation principles protected by the *Bruton* rule. The defendant Seebeck does not challenge the admissibility in his own case of the statements attributed specifically to him. Rather, he challenges the admission of the statements attributed to John and those that lacked attribution, claiming that the admission of these statements constituted a violation of the *Bruton* rule. We find no error.

As we indicated in part V, in *Bruton,* the United States Supreme Court held that a defendant is deprived of his rights under the confrontation clause when his codefendant's incriminating confession is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant. The

*Bruton* court held that the admission of the codefendant's statements "added substantial, perhaps even critical weight to the Government's case [against Bruton] in a form not subject to cross-examining, since Evans did not take the stand," and therefore, Bruton had been denied his rights of confrontation. *Bruton* v. *United States,* supra, 128. In *Bruton,* however, the court emphasized that it was dealing with a case in which "the hearsay statement inculpating petitioner was clearly inadmissible against him under traditional rules of evidence." Id., 128 n.3. Several lower courts have thus concluded that *Bruton* has no application when the statements of a codefendant are directly admissible against the defendant. See, e.g., *Kay* v. *United States,* 421 F.2d 1007 (9th Cir. 1970) (coconspirator statements); *Commonwealth* v. *McLaughlin,* 364 Mass. 211, 303 N.E.2d 338 (1973) (spontaneous utterance); *People* v. *Gauthier,* 28 Mich. App. 318, 184 N.W.2d 488 (1970) (business record). These holdings are supported by *Cruz* v. *New York,* 481 U.S. 186, 193, 107 S. Ct. 1714, 95 L. Ed. 2d 162 (1987), in which the court held that "where a nontestifying codefendant's confession incriminating the defendant is not directly admissible against the defendant . . . the Confrontation Clause bars its admission at their joint trial, even if the jury is instructed not to consider it against the defendant, and even if the defendant's own confession is admitted against him." We conclude that the admission of Adams's testimony did not violate the *Bruton* rule, because the statements attributed to either defendant were directly admissible against both of them, under the adoptive admissions exception to the hearsay rule.

An admission may be introduced only against the party who made the admission. *Palombizio* v. *Murphy,* 146 Conn. 352, 355–56, 150 A.2d 825 (1959). An accused can be held to have adopted a statement as his own, however, when his conduct indicates that he

assents to or adopts a statement made by another person. C. Tait & J. LaPlante, supra, § 11.5.5. Such adoption must be manifested by conduct or statements that are " 'unequivocal, positive and definite in nature, clearly showing that in fact [the] defendant intended to adopt the hearsay statements as his own.' " (Emphasis omitted.) *State* v. *Morrill,* 197 Conn. 507, 537, 498 A.2d 76 (1985).

We address each statement in the order that Adams testified that they had occurred. The statement not attributed to a particular defendant came in response to Adams's inquiry as to how the defendants had gotten to Ohio. One of the defendants replied that they had obtained a car from an old man who lived out in the woods, that they had run out of gas in New York, and that they had hitchhiked from New York to Ohio. The response, though unattributed, is especially significant, because it provided the predicate for further questioning by Adams, to which John and Seebeck each gave an answer; John answered Adams's question as to whether the car was stolen, and Seebeck answered Adams's question as to how the owner had died. The defendants' answers to these subsequent questions can only be understood as an unequivocal acceptance as true of the factual foundation of the unattributed remark. Thus, the fact that Adams was unable to recall which defendant answered this initial inquiry is not essential to the admissibility of the response, because both defendants manifested their adoption of that statement through their own responses to Adams's subsequent questions.

The same analysis applies to the remark attributed to John, that the car was not stolen because the owner was dead. Seebeck indicated his adoption of that statement through his own statement as to how the owner had died. Seebeck's response clearly indicated that he

must have accepted the veracity of John's statement, in order for his own statement to make any sense in the context of the conversation.

Seebeck's statement that the owner of the car had died of old age was similarly admissible against John as an adoptive admission by silence. "Generally, 'statements made within the accused's "hearing, which are relevant and material, to which he makes no reply, may be given in evidence as indicative of conduct on his part, when the circumstances show that he heard, understood and comprehended the statement, and the facts are known to him and he had the opportunity to speak and the circumstances naturally called for a reply from him." ' *State* v. *Harris,* 182 Conn. 220, 228, 438 A.2d 38 (1980), quoting *State* v. *Ferrone,* 97 Conn. 258, 265–66, 116 A. 336 (1922)." *State* v. *Morrill,* supra, 535.

Adams testified that he and the defendants were the only people in his car and that both defendants had been actively participating in this particular conversation. Thus, taken with John's response to the previous question, the circumstances indicate that John understood the context in which Seebeck's statement was made and that he had an opportunity to reply. Seebeck's statement called for a reply from John because it reinforced the fact that both defendants knew that the owner of the car was dead. Thus, Seebeck's statement was admissible against John as an adoptive admission by silence.

The defendant John raises the additional claim that the portion of Adams's testimony in which a statement was attributed to him should have been stricken, because it differed from the offer of proof. The state's offer of proof referred to *Seebeck* as the declarant, but Adams testified that *John* had told him that the owner of the car they had taken was dead. We have never held that a variation from an offer of proof requires that

the deviating testimony be stricken, in the absence of prejudice. The defendant cannot demonstrate that he was harmed by this variation. If Adams had attributed this statement to Seebeck, rather than John, it would have been admissible also against John as an adoptive admission by silence.

## VII

Nearly five years elapsed between the time of the victim's death and the arrest of the defendants. On April 4, 1986, each defendant moved to dismiss the information against him based upon this lapse of time. The trial court denied these motions. The defendants claim on appeal that the trial court erred in failing to dismiss the informations against them because of the lengthy pre-accusation delay.

" 'The role of due process protections with respect to pre-accusation delay has been characterized as a "limited" one. *United States* v. *Lovasco,* 431 U.S. 783, 789, 97 S. Ct. 2044, 52 L. Ed. 2d 752 (1977).' *State* v. *Morrill,* [supra, 521]." *State* v. *Littlejohn,* 199 Conn. 631, 645–46, 508 A.2d 1376 (1986). This court need only determine " 'whether the action complained of . . . violates those "fundamental conceptions of justice which lie at the base of our civil and political institutions," *Mooney* v. *Holohan,* 294 U.S. 103, 112 [55 S. Ct. 340, 79 L. Ed. 791] (1935), and which define "the community's sense of fair play and decency". . . .' *United States* v. *Lovasco,* supra, 790." *State* v. *Morrill,* supra, 521. "The due process clause has not replaced 'the applicable statute of limitations . . . [as] . . . the primary guarantee against bringing overly stale criminal charges.' *United States* v. *Marion,* [404 U.S. 307, 322, 92 S. Ct. 455, 30 L. Ed. 2d 468 (1971)] . . . ." *State* v. *Morrill,* supra, 521–22.

"In order to establish a due process violation because of pre-accusation delay, the defendant must show both

that actual substantial prejudice resulted from the delay and that the reasons for the delay were wholly unjustifiable, as where the state seeks to gain a tactical advantage over the defendant. . . . 'Marion makes clear that proof of prejudice is generally a necessary but not sufficient element of a due process claim, and that the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused.' *United States* v. *Lovasco,* supra, 790." (Citations omitted.) *State* v. *Morrill,* supra, 522.

We have found nothing in the record that would substantiate either of these requirements. The time of the victim's death was obviously a key factor in this case. It was vital, therefore, that the state establish with precision the time of death as June 20, 1980, and not some other time. The medical opinions of Galvin, the acting chief medical examiner, and Stephen Adams, an assistant medical examiner, went back as far as June 20, but included other intervening days. The state, therefore, had good reason not to begin prosecution of the case until it had other scientific evidence that would establish the time of death more precisely. In January, 1985, Galvin contacted Lord to ask him if he could render an opinion as to the time of the victim's death. Lord furnished Galvin with an opinion in February, 1985, that corroborated the time of death, June 20, indicated by other evidence. The Waterford police applied for and executed arrest warrants for the defendants less than two months after Galvin received the report from Lord. It is apparent that any delay in the arrest of the defendants was to obtain this entomological evidence and not to secure a tactical advantage. Further, we cannot find in this record that the defendants have shown, as they must, "actual substantial prejudice," such as the death or disappearance of a vital defense witness. See *State* v. *Littlejohn,* supra, 647 (delay of more than five years

held insufficient to dismiss charges); accord *State* v. *Gallagher,* 313 N.C. 132, 326 S.E.2d 873 (1985) (no due process violation in five year delay).

## VIII

### A

The defendants next claim that the trial court erred in instructing the jury on alternative theories of robbery, under General Statutes § 53a-133, larceny, under General Statutes § 53a-119, and attempt, under General Statutes § 53a-49 (a), when there was no evidence or insufficient evidence to support any of those crimes as the underlying felony.

We first consider whether this issue was properly preserved for review. The defendants did not except to the court's instructions at trial. "We generally do not consider a claimed error regarding the giving of or failure to give an instruction 'unless the matter is covered by a written request to charge or exception has been taken . . . immediately after the charge is delivered.' Practice Book § 852 (formerly § 854)." *State* v. *Hill,* 201 Conn. 505, 512, 523 A.2d 1252 (1986). Our holding in *State* v. *Williams,* 202 Conn. 349, 362–63, 521 A.2d 150 (1987), however, makes clear that a claim that the jury was presented with alternative forms of committing the offense for which there is no evidence or insufficient evidence is reviewable under *State* v. *Evans,* supra, 70, because it implicates a defendant's fundamental right to be convicted only upon proof beyond a reasonable doubt. See *State* v. *Hufford,* 205 Conn. 386, 399, 533 A.2d 866 (1987); see also *State* v. *Pelletier,* 209 Conn. 564, 575, 552 A.2d 805 (1989) (claim not raised at trial that court erred in instructing on alternative theories reviewed on appeal).

This court has stated that "[w]here a person may have been convicted under more than one statutory

alternative, the judgment cannot be supported unless the evidence was sufficient to establish guilt under each statutory provision which the trier may have relied upon." *State* v. *Marino,* 190 Conn. 639, 650–51, 462 A.2d 1021 (1983); *State* v. *Thompson,* 197 Conn. 67, 79, 495 A.2d 1054 (1985). "This rule is based on the principle that jurors are presumed to follow the instructions given by the judge." *State* v. *Williams,* supra, 363–64.

In accordance with § 53a-133, the trial court instructed the jury that "[a] person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of, one, preventing or overcoming resistance to the taking of property or to the retention thereof immediately after the taking; or two, compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of a larceny."

The defendants claim that while there was evidence that force was used to prevent or overcome resistance by the victim, there was no evidence that would permit the jury to conclude that force was used to compel the victim "to deliver up" the property or to otherwise assist in the larceny.

The state presented evidence that showed that the victim had been involved in a struggle near the front of his house and that he had been struck in the head with one or more bricks. From this evidence, the jury reasonably could have concluded that the defendants used this force to compel the victim to "deliver up" the keys to his car, and having so failed, they "[overcame his] resistance to the taking of [his] property." General Statutes § 53a-133 (1) and (2). Thus, because there was sufficient evidence from which the jury reasonably could have concluded that the victim was forced to

deliver up the property, the trial court did not err in instructing on that statutory alternative. *State* v. *Pelletier,* supra, 575–76.

The defendants claim that the trial court erred in its instruction on larceny as an element of robbery and also with respect to the separate larceny count. The court instructed the jury, in accordance with § 53a-119, that larceny could be accomplished by wrongfully "taking, obtaining or withholding" the property of another. The defendants claim that there was no evidence to support either "obtaining" or "withholding" which, they claim, are analytically distinct from a "taking." See id., 576.

In the context of this case, as in *State* v. *Pelletier,* supra, "the three words 'taking,' 'obtaining,' and 'withholding' are inseparable." We cannot distinguish a difference between the defendants' "taking" of the victim's property and their "obtaining" that property. Id. Further, "withholding" the victim's property conveys the idea that the defendants took and retained the victim's property against his objections, a scenario well supported by the evidence in this case. Thus, we find no error in those instructions.

The defendants assert that the trial court erred in instructing the jury on both forms of attempt liability under § 53a-49. They maintain that there was no evidence from which the jury could find either that there was a completed act which, except for a mistake of fact, would have been a robbery; General Statutes § 53a-49 (a) (1); or that there was an intended but uncompleted robbery. General Statutes § 53a-49 (a) (2). The defendants took no exception to the court's instructions on attempt liability. We find no reversible error.

A unanimous verdict of guilty of robbery necessarily encompasses a unanimous finding that the defendants had at least attempted to commit robbery. *State*

v. *Jones,* 193 Conn. 70, 76–77, 475 A.2d 1087 (1984). Thus, while it may have been inappropriate for the court to instruct the jury on attempt liability, when the evidence was clear that the defendants had committed a completed robbery, the defendants were not prejudiced by those instructions, because no juror "could have believed that the defendant[s] completed the robbery without first undertaking a substantial step torward achieving its object." Id., 76.

## B

The defendants claim also that, because the jury may have disagreed on the manner in which the offenses were committed, their right to a unanimous verdict was violated by the trial court's failure to instruct the jury that it had to agree unanimously on the factual predicate for the offenses.

As a preliminary matter, by failing to request a specific unanimity instruction, and by failing to except to the trial court's instructions immediately after they were given, the defendants have not preserved this claim of error for appellate review. *State* v. *Spigarolo,* 210 Conn. 359, 388, 556 A.2d 112 (1989). We nonetheless review this unpreserved claim, because the right to a unanimous verdict is a fundamental right and implicates the defendants' right to a fair trial. Id.; *State* v. *Suggs,* 209 Conn. 733, 760, 553 A.2d 1110 (1989); *State* v. *Evans,* supra. We find no error in the court's instructions.

" 'Where a trial court charges a jury that the commission of any one of several alternative acts would subject a defendant to criminal liability, a unanimity charge on a specific act is required only if two conditions are met: (1) the alternative acts are *conceptually distinct* from each other; *and* (2) the state has presented *supporting evidence* on each alternative act.' " (Emphasis in original.) *State* v. *Bailey,* 209 Conn. 322, 334, 551

A.2d 1206 (1988), quoting *State* v. *Flynn,* 14 Conn. App. 10, 38, 539 A.2d 1005, cert. denied, 488 U.S.    , 109 S. Ct. 226, 102 L. Ed. 2d 217 (1988).

The defendants assert that, with respect to the robbery instructions, the trial court should have charged the jurors that they had to agree on the purpose for which force was used by the defendants. We conclude that no such instruction was necessary.

The evidence presented at trial demonstrates that the two purposes for which force may be used to commit a robbery were not "conceptually distinct." As we stated earlier, the evidence indicated that a short encounter transpired between the victim and the defendants, from which the jury could reasonably have concluded that both types of force were implicated. Under those circumstances, we conclude that it is appropriate to adopt the analysis of those cases that have held that "a specific unanimity charge is not required where the defendant's conduct does not comprise 'separate incidents' implicating alternative or conceptually distinct bases of liability." See *State* v. *Bailey,* supra, 336.

In *State* v. *Giwosky,* 109 Wis. 2d 446, 456, 326 N.W.2d 232 (1982), for example, the court held that the trial court was not required to instruct the jury that it must unanimously agree on whether the defendant had committed a battery (1) when he threw a log at the victim, or (2) when he struck the victim with his fists. The court concluded that the encounter, which lasted two minutes, "was a short continuous incident that cannot be factually separated." Id. Similarly, in the present case, the evidence indicated a short continuous incident that could not be atomized into discrete, distinct events. *State* v. *Bailey,* supra, 337; *State* v. *Giwosky,* supra. It would have been unreasonable, therefore, to require the jurors to parse this evidence

into separate legal compartments, because to do so would require them "to draw a line finer than that which the human conduct sought to be defined will realistically permit." *State* v. *Giwosky,* supra, 458.[11]

With respect to the larceny instructions, this court rejected the similar claim in *State* v. *Pelletier,* supra, 576, that "taking," "obtaining" and "withholding" are conceptually distinct. We held in *Pelletier,* as we do in this case, that the three words are inseparable when applied to a robbery of the kind involved here. Accordingly, the trial court was not required to give a specific unanimity instruction on larceny.

The defendants claim that the trial court was required to give a specific unanimity instruction on attempt liability. It bears repeating that the defendants requested no such charge, nor did they object to the charge as given. Further, they have given this court no reasons on appeal why the two forms of attempt liability are conceptually distinct. As we noted earlier, the attempt instructions in this case were inappropriate, because the evidence was so abundant that a completed offense had been committed. We need not decide, therefore, whether the two forms of attempt liability set forth in § 53a-49 are "conceptually distinct." Rather, we limit our discussion to determining whether it is reasonably possible that the jury was misled. *State* v. *Bailey,* supra, 338; *State* v. *Quintana,* 209 Conn. 34, 50, 547 A.2d 534 (1988). " ' "The whole charge must be considered from the standpoint of its effect on the jury in guiding them to a proper verdict . . . and not critically dis-

---

[11] This court's holding in *State* v. *Williams,* 202 Conn. 349, 521 A.2d 150 (1987), is not to the contrary. In *Williams,* the state conceded that there was no evidence to support a theory that force was used to compel the victim to "deliver up" the purse. We had no occasion, therefore, to decide whether the two purposes for which force can be used to commit a robbery are "conceptually distinct," because the specific unanimity situation was simply not present.

sected in a microscopic search for possible error . . . ." ' " *State* v. *Quintana,* supra, 51. In the present case, the trial court's instructions adequately conveyed to the jury an understanding that its verdict must be unanimous. Further, on several occasions the court informed the jury that its responsibility was to determine what had actually taken place. In view of these instructions, we conclude that it was not reasonably possible that the jury was misled.

## IX

The defendant Seebeck received a sentence of twenty-five years to life for the felony murder conviction and ten to twenty years for the manslaughter conviction, the sentences to run concurrently. The defendant claims that the imposition of sentences for both convictions violates the multiple punishment prohibition of the double jeopardy clause of the fifth amendment to the United States constitution, because both convictions relate to but one death. We agree with the defendant that the two sentences constitute multiple punishments for one offense.

The double jeopardy clause of the fifth amendment to the United States constitution provides: "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb." This clause prohibits not only multiple trials for the same offense but also multiple punishments for the same offense. *Brown* v. *Ohio,* 432 U.S. 161, 165, 97 S. Ct. 2221, 53 L. Ed. 2d 187 (1977). " 'Double jeopardy analysis in the context of a single trial is a two-step process. First, the charges must arise out of the same act or transaction. Second, it must be determined whether the charged crimes are the same offense. Multiple punishments are forbidden only if both conditions are met.' " *State* v. *Boucino,* 199 Conn. 207, 222, 506 A.2d 125 (1986).

As a preliminary matter, the state maintains that because the trial court imposed concurrent sentences for the two convictions, the double jeopardy clause is not violated, in that the two sentences constitute a single punishment. Thus, before undertaking the two-step analysis, we must first resolve the threshold issue of whether multiple punishments have been imposed. We conclude that because adverse collateral consequences may result from the fact of an additional conviction, multiple punishments were imposed in this case, despite the fact that the sentences are to be served concurrently.

In *Benton* v. *Maryland,* 395 U.S. 784, 790, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969), quoting *Sibron* v. *New York,* 392 U.S. 40, 55, 88 S. Ct. 1889, 20 L. Ed. 2d 917 (1968), the court stated that "most criminal convictions do in fact entail adverse collateral legal consequences." These consequences include "the possibility, as to [the] defendant, that officials or other persons considering [the] defendant's record in the future, whether for purposes of parole, employment, impeachment as [a] witness, etc., may misapprehend the two convictions as relating to separate criminal activities." *United States* v. *Hooper,* 432 F.2d 604, 605 n.3 (D.C. Cir. 1970). The court in *Benton* concluded that, because of this possibility, "there is no jurisdictional bar to consideration of challenges to multiple convictions, even though concurrent sentences were imposed." *Benton* v. *Maryland,* supra, 791. This holding implicitly recognizes that the adverse consequences that may flow from an additional conviction are separate punishment for the purposes of the double jeopardy clause, even though the sentences are to be served concurrently. We conclude, therefore, that because of the possibility of adverse collateral consequences from the second conviction, the two sentences in this case are not a single punishment. Having resolved this threshold issue, we turn to the

two-step analysis to determine whether the two crimes are one offense for double jeopardy purposes.

There is no dispute in this case that the charges of manslaughter and felony murder arose out of the same act or transaction. Thus, the issue becomes whether these crimes are separate or the same offenses for purposes of double jeopardy. " 'The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not.' *Blockburger* v. *United States,* 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932)." *State* v. *Palmer,* 206 Conn. 40, 52, 536 A.2d 936 (1988). "In conducting this inquiry, we look only to the relevant statutes, the information, and the bill of particulars, not to the evidence presented at trial." *State* v. *Wright,* 197 Conn. 588, 593, 500 A.2d 547 (1985).

In the present case, the felony murder charge required proof of the predicate offense of robbery, but did not require proof of a specific intent to do harm. Manslaughter in the first degree, on the other hand, does not require proof of any predicate offense, but generally does require proof of intent to cause serious physical injury or death. Because each offense requires proof of an additional fact that the other does not, it appears from an application of the *Blockburger* test that no double jeopardy violation has occurred. On the basis of our holding in *State* v. *Couture,* 194 Conn. 530, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985), and a review of the felony murder statute, however, we conclude that the legislature contemplated that the two statutory provisions should be treated as a single crime for double jeopardy purposes.

The legislative history of the felony murder statute, § 53a-54c, indicates that its purpose was to fill an omission in the statutory definition of murder in § 53a-54a. In restoring the concept of felony murder, which had been omitted from the original enactment of the penal code, the legislature intended to specify another manner in which the crime of murder could be committed, rather than create a new crime. Such a purpose would have been in keeping with this state's murder statute prior to the enactment of the penal code, when the felony murder principle was simply included in the statutory definition of first degree murder. General Statutes § 53-9. Thus, an indictment charging an intentional killing and also a killing in the perpetration of a robbery was held not to be duplicitous for charging two separate crimes in a single count, because the court viewed the indictment as alleging alternative methods by which the single crime of murder had been committed. *State* v. *Edwards,* 163 Conn. 527, 532, 316 A.2d 387 (1972). The fact that separate counts were used in the indictment similarly did not alter the fact that only a single crime of murder was involved. See *State* v. *Hamlin,* 47 Conn. 95, 120 (1879).

Our recent holding in *State* v. *Couture,* supra, supports this interpretation of the murder and felony murder statutes. In *Couture,* we stated that "[a]n indictment charging an accused with intentional and felony murder of a particular victim charges a single offense, committed conjunctively in two different ways." Id., 560. The history of the murder and felony murder statutes, read in conjunction with our holding in *Couture,* indicates that the legislature contemplated that only one punishment would be imposed for a single homicide, even if that homicide involved the violation of two separate statutory provisions. It follows from this discussion, therefore, that the imposition of sentences for both the manslaughter and the felony

murder convictions, for a single homicide, was contrary to the intention of the legislature as expressed in the statutes and as ascertainable from the history of the adoption of § 53a-54c. Accordingly, we vacate the manslaughter conviction and sentence of Seebeck, and affirm the remaining sentence in all other respects.

In the first appeal, there is no error; in the second appeal, there is error in part and the case is remanded to the trial court with direction to vacate the judgment of conviction on the manslaughter charge and render judgment as on file except as modified by this opinion.

In this opinion the other justices concurred.