[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The petitioners herein, on a claim of newly discovered evidence, have filed these revised amended petitions for a new trial pursuant to Connecticut General Statute Sec. 52-270 and Practice Book Sec. 904. These petitions arise after the Supreme Court affirmed the convictions of the petitioners in a joint trial for felony murder and larceny in the second CT Page 740 degree in connection with the death of Ponte Patterson whose body was discovered on the morning of June 24, 1980. State v.John, 210 Conn. 652 (1989).
The petitioners offered evidence which they claim is newly discovered and which they claim demonstrates (1) the motive and opportunity of another to have caused the death of Patterson; and (2) that the time of Patterson's death was at a time after the petitioners had been known to have left the State of Connecticut.
 I
The testimony of Det. Ronald McCarthy, Mr. B and Mr. M developed evidence that periodically, Patterson arranged a young man to have sexual intercourse with a Mrs. X which was participated in at Patterson's home in the presence of Mr. X. (The court allowed the aliases to be used to avoid unnecessary embarrassment to those parties.) The petitioners knew the names of B and M. None of the participants were asked to give consideration to the others, but on at least one occasion, that of Mr. M, Patterson did request and receive a homosexual episode as consideration. All these sexual events, except for Mr. B's, occurred one or more years before the death of Patterson. Mr. B's occurred several weeks before Patterson's death. Patterson was the only person who knew the participants.
Mr. M called the police concerning his relationship with Patterson on June 24, 1980, the date on which his body was found and revealed the information of his involvement in the sexual encounters within days of the death in an interview with Det. McCarthy. In early July, 1980 Mr. B and Couple X were likewise interviewed by Det. McCarthy. Det. McCarthy testified that B told him that B gave Patterson a ride home on Friday, June 20th about 3:30 to 3:45 p. m. after B had left work and had talked about a tennis match in France. In later discussions and investigations McCarthy determined that B was uncertain about the date and that a tennis match, the French Open, was held between May 29th and June 6th. These statements of B to Det. McCarthy were known by the petitioner during the trial and produced through Det. McCarthy by the petitioners except for B's subsequent uncertainty of the date, which was likewise known by the petitioners at the criminal trial. CT Page 741
The petitioners claim that this recanted statement as to the date of picking up Patterson by B together with the disclosed sexual activity provides both opportunity and motive. Further, that B became uncertain of the date only when the date of June 20th was being considered as the possible date of Patterson's death. They also note the truculent nature of his testimony in cross-examination. The logic is flawed. It is natural for people to be unfriendly to others who wish to expose to the public their private activities. It is common for the perpetrator of a crime to distance himself from the scene thereof and if B had known that the crime was committed on June 20th, it would be folly to have acknowledged giving Patterson a ride on that very day. As to the arranged sexual encounter, there is no evidence to justify believing it formed a motive to commit homicide. Such speculation is not some evidence that directly connects B with the crime to warrant admission in the criminal trial of the petitioner. State v. Giguere, 184 Conn. 400, 405. As the Supreme Court stated in its decision on the appeal of this case citing State v. Marshall, 166 Conn. 593, 601 "evidence of the motive of one other than the defendant to commit the crime will be excluded where there is no other proof in the case which tends to connect such other person with the offense with which the defendant is charged." State v. John,210 Conn. 652, 671.
 II
The petitioners offered in evidence two depositions taken of Wayne Lord, an entomologist, who testified at the trial. The focus of their claim as newly discovered evidence is that Dr. Lord's testimony at the trial was crucial in establishing the time of death of Patterson to be late morning or early afternoon of Friday, June 20, 1980 but, since that testimony in 1986, he has given opinion in subsequent homicide cases which differs entomologically from the Patterson case. Contrary to this claim, Dr. Lord, in his depositions of September 7, 1990 and again on June 9, 1992, reiterated his opinion that he has not changed his opinion, his methodology or that the green blowfly, Phoenicia Serricata, is not active at night nor in adverse weather conditions. He testified that he still uses the same behavioral information of the flies found on the dead body with concern for the environmental conditions which had been present to analyze how long before CT Page 742 such conditions death may have occurred.
The petitioners also offered the testimony of Dr. William Kriniski through whom two scientific papers were introduced into evidence, one of which was the "Nocturnal Oviposition Behaviour of Blow Flies" by Bernard Greenberg published in 1990. Dr. Kriniski, Dr. Greenberg and Dr. Lord, all entomologists, testified at the petitioner's criminal trial. Drs. Kriniski and Greenberg testified at the trial that in their opinion, from analysis of the stage of larvae on the Patterson body, death could not have occurred before Saturday, June 21, 1980. Their opinions were based on their belief that nocturnal oviposition of the blow flies does occur. The petitioners did not offer this evidence simply to bolster Drs. Kriniski's and Greenberg's opinion but to show that in Dr. Lord's deposition of June 9, 1992 he did not dispute Dr. Greenberg's observation of such nocturnal oviposition. Dr. Lord however, after stating that if Dr. Greenberg said he saw oviposition at night, he believed he saw it, added that no one else has been able to duplicate such observations and he recalled a respected entomologist, Entrona, who had a paper published that his study in Maryland found that egg laying of blow flies did not occur at night.
It is clear that the essence of this evidence is not newly discovered but the same offered at the trial. Likewise Dr. Lord's opinion given in 1986 may have been crucial in opening the police investigation to include Friday as a possible day of death but was not, as petitioners claim, crucial in establishing the time of death. Even if Dr. Lord had joined in the opinions shared by Drs. Kriniski and Greenberg, the joinder would not have excluded Friday as the date of Patterson's death in light of the other evidence produced in the criminal trial.
 III
"The standard that governs the granting of a petition for a new trial based on newly discovered evidence is well established. The petitioner must demonstrate, by a preponderance of the evidence, that: (1) proffered evidence is newly discovered, such that it could not have been discovered earlier by the exercise of due diligence; (2) it would be material on a new trial; (3) it is not merely cumulative; and (4) it is likely to produce a different result CT Page 743 in a new trial." Asherman v. State, 202 Conn. 429, 434. The first three criteria has been examined previously negatively as to the evidence offered by the petitioners. However, even if the evidence concerning B's activities and Dr. Lord's opinions are weighed against the evidence presented in the original trial, it is not likely to produce a different result as required by the fourth criterion.
The evidence presented in the original trial was that the body of seventy year old Patterson was found on Tuesday, June 24, 1980 in a wooded area of his rear yard in Waterford with several blood-stained bricks near the body. The cause of death was a depressed skull fracture with laceration of the brain, caused by an object such as the corner of a brick. There was evidence of a struggle in the front yard where a blood-stained brick laid on matted down grass. Scuff marks from the front yard indicated Patterson had been dragged by his legs to the place where his body was found and his right front pants pocket was inside out and empty, the pocket in which it was known he kept his keys. No keys either to his car or his house were found on the body or premises. The only things found missing were his keys and car, a 1965 bluish-green Buick.
On Wednesday June 18, 1980, the petitioners were at the home of Morris Frost when Seebek stated he was leaving town and he knew where he could get a car from a seventy year old queer in Waterford. Early Friday afternoon, on June 20, 1980, the petitioners visited Seebek's parent's home in Oakdale and after Seebek told his parents he was leaving the state, the petitioners drove away in an old green automobile. At 5:15 p. m. that same day Patterson's green Buick was found abandoned out of gas, on the shoulder of the westbound lane of Interstate 84 in Brewster, New York, a two and one-half hour drive from Waterford. The petitioners' fingerprints were found in the car and Patterson's key case containing both his car and house keys were found on the ground nearby. John called his mother from Bloomsbury, Pennsylvania on June 21, 1980 and on June 22, 1980 called his father from the same location. On Tuesday, June 24, 1990, the petitioners were picked up on the Ohio Turnpike in Sandusky, Ohio by Michael Adams who drove them to Andalusa, Illinois, a seven hour trip. He asked them how they got that for and one of them stated they had gotten a car from an old man who lived out in the woods, had run out of gas in New York and hitchhiked to Ohio. CT Page 744 Adams asked if the car had been stolen and John answered no because the guy who owned it was dead. Adams asked how the owner had died and Seebek answered from old age or something. Adams asked if anyone knew he was dead and neither answered.
M, a friend of Patterson, called him at noon on June 20, 1980 and talked to him briefly, when Patterson said he couldn't talk to him right then and would call back in one-half hour. When M did not receive the call back, he called at 12:30 p. m. and 12:45 p. m. and again on Saturday and Sunday without getting an answer. The police found Patterson's Friday mail which was still in the mail box even though Patterson was known to pick up his mail promptly. The police also found a copper bracelet which a friend of Seebek's said looked just like the one he had given him several weeks before in the front yard where the evidence of a struggle was. Eleanore Imlay who knew Patterson since childhood and was familiar with his house and passed it frequently. She recalled passing it three times the week ending June 21, 1980 and on one occasion saw two young men dragging something heavy toward the back of the house and saw a blue car which she had seen before. Her description of the area where the two men were dragging was in the area of the scuff marks and the area which she described seeing the car was where it normally was parked. From her diary she determined the three times to be, once in the morning of June 18, once shortly after noon on June 20 and once at about 4:30 p. m. on June 21.
Both Dr. Adams, the Assistant Medial Examiner and Dr. Galvin, the Acting Chief Medical Examiner, who did the autopsy, were of the opinion death occurred two to four days before June 24 when Patterson's body was found. Dr. Lord, a forensic entomologist, whose depositions were exhibits as well as his trial testimony, was of the opinion at trial that the death occurred sometime between the late afternoon of June 19, 1980 and the early afternoon of June 21 and in his depositions that his opinion has not changed.
This evidence not only provides an expressed motive for the petitioners to be the perpetrators of the homicide but places them at the scene doing the act itself to the exclusion of others. Such evidence could only be overcome if the forensic entomological evidence was able to completely exclude Friday as the day of Patterson's death which, given the variables involved, it could not and somehow the petitioner's CT Page 745 trip west did not take place and Adams' testimony was fabricated.
For the above reasons the petitions are denied.
Thomas H. Corrigan Judge Trial Referee.