ERICH SEEBECK *v.* STATE OF CONNECTICUT
(SC 15822)

Callahan, C. J., and Borden, Berdon, Palmer and McDonald, Js.

Argued April 30—officially released August 25, 1998

*Martin Zeldis*, senior assistant public defender, for the appellant (petitioner).

*Kevin T. Kane*, state's attorney, for the appellee (respondent).

*Opinion*

BORDEN, J. This appeal raises three principal issues: (1) When a trial court has denied a petitioner's request for certification to appeal, pursuant to General Statutes § 54-95 (a),[1] from its denial of a petition for a new trial, does this court have subject matter jurisdiction to consider the petitioner's appeal? (2) If this court has subject matter jurisdiction to consider such an appeal, what is the proper scope of review of the trial court's denial of certification to appeal? (3) Pursuant to that scope of review, did the trial court improperly deny the petitioner's request for certification to appeal? The petitioner, Erich Seebeck, appeals[2] from the trial court's judgment denying his petition for a new trial pursuant to General Statutes § 52-270 (a),[3] and denying his request for certification to appeal from that judgment.[4]

---

[1] General Statutes § 54-95 provides in relevant part: "Appeal by defendant in criminal prosecution; stay of execution. (a) Any defendant in a criminal prosecution, aggrieved by any decision of the Superior Court, upon the trial thereof, or by any error apparent upon the record of such prosecution, may be relieved by appeal, petition for a new trial or writ of error, in the same manner and with the same effect as in civil actions. No appeal may be taken from a judgment denying a petition for a new trial unless, within ten days after the judgment is rendered, the judge who heard the case or a judge of the Supreme Court or the Appellate Court, as the case may be, certifies that a question is involved in the decision which ought to be reviewed by the Supreme Court or by the Appellate Court. It shall be sufficient service of any such writ of error or petition for a new trial to serve it upon the state's attorney for the judicial district where it is brought. . . ."

[2] The petitioner appealed from the judgment of the trial court to the Appellate Court, and we transferred the case to this court pursuant to Practice Book § 4023, now Practice Book (1998 Rev.) § 65-1, and General Statutes § 51-199 (c).

[3] General Statutes § 52-270 provides in relevant part: "Causes for which new trials may be granted. (a) The Superior Court may grant a new trial of any action that may come before it, for mispleading, the discovery of new evidence or want of actual notice of the action to any defendant or of a reasonable opportunity to appear and defend, when a just defense in whole or part existed . . . ."

[4] The petitioner's codefendant in the criminal trial, Adam John, filed a similar petition for a new trial. The trial court heard both petitions together, and denied them both in a single memorandum of decision. John's appeal

The petitioner claims that the trial court improperly: (1) denied his petition for a new trial; and (2) denied his request for certification to appeal. The respondent state of Connecticut claims that: (1) in the absence of a grant of certification to appeal, this court has no subject matter jurisdiction over the petitioner's appeal; and (2) even if we do have jurisdiction, the trial court properly denied the petition for a new trial and the request for certification to appeal. We conclude that we have subject matter jurisdiction to consider an appeal from a denial of a petition for a new trial filed pursuant to § 52-270 (a), even when the trial court has denied certification to appeal pursuant to § 54-95 (a). Applying the appropriate scope of review to such a denial of certification to appeal, however, we conclude that the trial court did not abuse its discretion in denying the petitioner's request for certification to appeal. Accordingly, we dismiss the appeal.

On August 26, 1986, the petitioner and a codefendant, Adam John, were convicted of felony murder[5] and larceny in the second degree. Both the petitioner and John appealed from the judgment of conviction to this court, and in *State* v. *John*, 210 Conn. 652, 557 A.2d 93, cert. denied, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989), we affirmed the judgment.

In that initial appeal, we stated that "[t]he jury reasonably could have found the following facts. During the late morning of Wednesday, June 18, 1980, the defendants visited the home of Morris Frost, an acquaintance.

from the trial court's judgment has been stayed in the Appellate Court pending the disposition of this appeal. *John* v. *State*, Docket No. AC 17449 (1997).

[5] The petitioner was also convicted of manslaughter in the first degree, but on appeal that conviction was vacated on the ground that "the imposition of sentences for both the manslaughter and the felony murder convictions, for a single homicide, was contrary to the intention of the legislature . . . ." *State* v. *John*, 210 Conn. 652, 696–97, 557 A.2d 93, cert. denied, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989).

While the three were sitting at Frost's kitchen table, [the petitioner] stated that he had been arrested that morning and that he was going to leave the state. [The petitioner] told Frost that he knew where he could 'get a car from a seventy year old queer in Waterford.'

"On Thursday, June 19, 1980, Ponte Patterson, the victim, picked up his dog from a veterinarian clinic. The next morning, on Friday, June 20, 1980, at about 10 a.m., [the victim] phoned the veterinarian to discuss the condition and treatment of his dog. At noon on that Friday, M, [the victim's] friend, phoned [the victim] at [the victim's] home in Waterford. The two spoke briefly, at which time [the victim] told M that he could not speak with him at that time, and that he would call back M in one-half hour. When [the victim] did not return the phone call, M phoned [the victim] at 12:30 p.m. and again at 12:45 p.m., getting no answer each time. M phoned [the victim] on Saturday and Sunday as well, still getting no answer.[6]

"Early Friday afternoon, on June 20, 1980, the defendants arrived at the home of [the petitioner's] parents in Oakdale. Prior to this visit, [the petitioner], who did not live with his parents, had seen his parents infrequently. [The petitioner] informed his parents that he was leaving the state to 'get his head on straight.' The defendants left the house, crossed the street, and drove away in an old green automobile.

"At 5:15 p.m. on that Friday, a green 1965 Buick was found abandoned and out of gas on the shoulder of the westbound lane of Interstate 84 in Brewster, New York. Brewster is a two and one-half hour drive from Waterford. The car was registered to [the victim]; it had not been reported stolen. The defendants' fingerprints were

[6] The identity of certain individuals has remained undisclosed since the inception of the investigation in this case to protect their privacy.

found inside the car, [the petitioner's] on the driver's side and John's on the front passenger's side.

"After abandoning the car in Brewster, the defendants continued westward. On June 21, 1980, John called his mother from Bloomsburg, Pennsylvania, and on June 22, 1980, he called his father from the same location. On Tuesday, June 24, 1980, between 2 p.m. and 3 p.m., Michael Adams, who was traveling on the Ohio Turnpike, picked up the defendants, who were hitchhiking, in Sandusky, Ohio, and drove them to Andalusia, Illinois. The defendants had no money and had with them only the clothes that they were wearing and two or three blankets. The defendants rode with Adams for seven hours, during which time [the petitioner] sat in the front passenger seat and John sat in the middle of the back seat.

"During the course of the trip, Adams asked the defendants how they had gotten as far as Ohio. One of the defendants responded that they had gotten a car from an old man who lived out in the woods, that they had run out of gas in New York, and that they had hitchhiked from New York to Ohio. When asked by Adams whether the car had been stolen, John responded that the car was not stolen, because 'the guy that owned it was dead.' [The petitioner] did not respond to this statement. Adams then asked them how the owner of the car had died. [The petitioner] answered that he had died 'of old age or something.' Adams asked the defendants whether anyone else knew that the owner of the car was dead, to which question neither defendant responded.

"On the same Tuesday morning, June 24, 1980, the body of [the victim], a seventy year old man, was found by two of his cousins in the backyard of his house, located in a wooded area in Waterford. One of them

contacted the police, who arrived at [the victim's] house at about 10 a.m.

"Examination of the area in front of the victim's house revealed that a struggle apparently had taken place there, because the victim's hat, bow tie and camera were strewn about. Near the front door, the police found an area of matted down grass on which there was a bloodstained brick, and from that area, there were drag marks along the right side of the house to the rear corner where the body was found. The victim's body and his clothing were in a position that indicated that he had been dragged by his feet. The victim's right front pants pocket, in which he ordinarily kept his keys, was inside out and empty. No keys to his car or house were found at the scene, inside the house, or on his person, and the victim's car was missing. Several bloodstained bricks were found on the ground near the victim's head.

"In the front yard, in the area where the struggle had occurred, the police found a bent copper bracelet, which looked 'just like' a copper bracelet that a friend of [the petitioner's] had given back to [him] several weeks earlier. In the victim's mailbox, across the street from his house, the police found mail that had been delivered on Friday, June 20, between 2 and 2:30 p.m., and was still in the box on June 24, even though [the victim] usually picked up his mail from the box every day.

"An autopsy revealed that the victim had suffered extensive injuries to the head, a fractured skull, a broken right arm, a dislocated wrist, four stab wounds in the back, and six fractured ribs. The cause of death was a depressed skull fracture with laceration of the brain, caused by an object such as the corner of a brick. There was considerable maggot activity on the victim's head and body.

"Stephen Adams, an assistant medical examiner, went to the scene to investigate the circumstances of the victim's death. On the basis of his observations of the victim's body, the yard, and surrounding locations, Adams concluded that [the victim] had died two to four days before his body was discovered on June 24. Catherine Galvin, the acting chief medical examiner, who had performed the autopsy, examined photographs of the victim's body taken at the scene, inspected temperature records and viewed the actual scene. She concluded that within reasonable medical probability, the time span between the victim's death and the delivery of his body to the medical examiner's office on June 24 was between two and four days. Wayne Lord, a forensic entomologist who had been consulted by the office of the chief medical examiner, concluded that the victim's death occurred sometime between the late afternoon of June 19 and the early afternoon of June 21." Id., 656–59.

On appeal to this court, the defendants claimed, inter alia, that the trial court improperly had denied their motions for acquittal based on an alleged insufficiency of the evidence. Id., 655. They claimed that "the 'uncontradicted evidence' indicated that the victim was alive at a time after they had left Connecticut, and that a rational jury, having viewed this evidence, could not have concluded that they were guilty beyond a reasonable doubt." Id., 660.

We rejected that claim. Although the defendants had presented witnesses to establish that the victim was alive after Friday, June 20, 1980, the state demonstrated inconsistencies in that testimony. Id., 661. In addition, the state "presented considerable evidence" that the victim died some time during the afternoon of June 20. Id. That evidence included the following: "M said that he had spoken with the victim shortly before noon on June 20, 1980. The victim did not call back in thirty

minutes as promised and did not answer his phone when M called back at 12:30 p.m. and 12:45 p.m. on that date. The victim did not answer the phone when others called him from June 21 to June 24. The victim's June 20 mail, which was delivered between 2 and 2:30 p.m. on that day, was still in the victim's mailbox on June 24, even though the victim customarily removed his mail every day. The medical examiner established that the victim had died between June 20 and June 22 and [Lord] . . . testified that the victim most likely died during the late morning or early afternoon of Friday, June 20, 1980.

"The state also presented evidence to prove that the victim's car had been found abandoned at 5 p.m. on June 20, in a location two and one-half hours from Waterford, with the defendants' fingerprints inside the car. The state proved that when the defendants were with Michael Adams, before the discovery of [the victim's] body was generally known, they were aware that the owner, an 'old man who lived in the woods,' was dead. On the basis of this evidence and the reasonable inferences drawn therefrom, the jury could have concluded that the victim was killed at about noon on June 20, 1980, that his car was stolen shortly after he was killed, and that the only way the defendants could have known of the victim's death was through their participation in the homicide of the victim, the theft of his car, and their immediate flight from the state in that car. Although the evidence against the defendants was in part circumstantial, the jury could nonetheless have found that the defendants were guilty beyond a reasonable doubt." Id., 661–62.

In their original appeal, the defendants also claimed "that the trial court [*Walsh, J.*] had erred in failing to disclose at trial certain portions of statements made to the police by B . . . relating to [his] associations with the victim." Id., 666. These statements were described

in a report prepared by Detective Donald J. McCarthy of the Waterford police department based on an interview that he had conducted with B on July 8, 1980. "More than one year before trial the state disclosed to the defendants, as exculpatory evidence, [portions of that report, including] a statement made by B to [McCarthy] that at about 3:30 p.m. on the day the state claimed the murder had occurred, June 20, 1980, B had given the victim, with whom he was previously acquainted, a ride to an intersection near the victim's home. The state also informed them that in later interviews with [McCarthy] B had indicated that he was uncertain of the date when he gave a ride to the victim. At trial B came to court as a possible witness for the defendants, but was never called upon to testify. [McCarthy] testified, however, without objection, as to the content of B's statement relating to his driving the victim toward his home at about the time the murder was claimed to have occurred. During this testimony the court ordered that the portions of the police report containing this statement be marked as an exhibit for identification and made available to the defendants. The remainder of the report, which contained no exculpatory information in the view of the court, was not disclosed, however, and was sealed. It was made available to the defendants after the trial for the purpose of the appeals.

"The portion of the report that [the trial court did not permit] the defendants . . . to see at the trial contained a statement of B that he knew of the victim's homosexual tendencies and that he recalled an occasion about one year before when the victim had made a sexual advance toward him. B also told the police investigator that 'nothing came of these advances and he and the victim had remained friends.' During this interview a color photograph of B in ordinary attire found by the police in the victim's house was shown to B, who recalled that it was probably taken about

one month before the date of the homicide." Id., 667–68. On appeal, the defendants claimed that the trial court's decision not to disclose this evidence on the basis that it was not exculpatory, was improper. Id., 666.

In addition, the defendants made further claims on appeal regarding "an additional part of the police report concerning B [that] had not been disclosed to the trial court" during the trial. Id., 668. This portion of the report described B's telling "of an incident that had occurred during the month preceding the murder in which the victim had arranged for B to have a 'sexual encounter' with a married woman at the victim's home." Id., 668. This omission was discovered during the pendency of the appeal. Id. "This discovery became the basis for motions for a new trial filed by the defendants, which were heard by [Judge Walsh] who had presided at the trial. He denied the motions, finding that the state's failure to have delivered the entire report during the trial had been inadvertent. He also concluded that, if the missing part of the report had been presented at the time of the ruling on disclosure, it would not have been made available to the defendants because it contained no exculpatory material." Id. On appeal, the defendants claimed that: "(1) the withholding of the full police report by the state constituted prejudicial prosecutorial misconduct; and (2) the trial court erred in denying the defendants' motions for a new trial based upon its ruling that the withheld portions of the report were not exculpatory." Id., 656.

This court rejected all of the defendants' claims regarding the police report prepared by McCarthy concerning B, stating: "The defendants have not demonstrated nor can we conceive of any way in which the portions of the police report concerning B that were not disclosed at trial can reasonably be said to contain evidence favorable to the defendants and so material to their guilt as 'to undermine confidence in the outcome.'

*United States* v. *Bagley*, [473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985)]. Since B did not testify at the trial, despite his availability, the undisclosed information, being hearsay, could not have been used for any purpose at trial, even if it were otherwise admissible. Furthermore, the defendants had no reason to attempt to discredit B, because his statement indicating that the victim had not been killed until sometime after 3:30 p.m. on June 20, 1980, supported their alibi that they had left Connecticut in the car they stole from the victim prior to his death. The defendants argue, nevertheless, that, if they had obtained the missing information earlier, they might, through further investigation, have discovered evidence pointing to B as the offender sufficient to raise a reasonable doubt as to their guilt. In support of their claim that the undisclosed portions of the report implicated B as a suspect, the defendants refer to B's admissions that his photograph found in the victim's home had been taken within one month before the date of the murder, that the victim had made homosexual advances to him, and that the victim had arranged for him to engage in a sexual relationship with a married woman. They maintain that this evidence of possible motivation on the part of B to kill the victim together with his statement to [McCarthy] that he had given the victim a ride at 3:30 p.m. on June 20, 1980, making B the last person to have admitted seeing the victim alive, was sufficient to have affected the outcome of the trial.

"We agree with the trial court that none of the evidence kept from the defendants at the trial was sufficiently relevant to have been admissible. 'A defendant may give evidence concerning a third party's involvement with the crime, as long as there is some evidence which directly connects the third party with the crime.' *Siemon* v. *Stoughton*, 184 Conn. 547, 555, 440 A.2d 210 (1981); *State* v. *Giguere*, 184 Conn. 400, 405, 439 A.2d

1040 (1981); *State* v. *Marshall,* 166 Conn. 593, 601, 353 A.2d 756 (1974); *State* v. *Perelli,* 125 Conn. 321, 328, 5 A.2d 705 (1939). Even if the defendants' unwarranted assumption were sound that the undisclosed evidence supports an inference of a motive for B to kill the victim, '[e]vidence of the motive of one other than the defendant to commit the crime will be excluded where there is no other proof in the case which tends to connect such other person with the offense with which the defendant is charged.' *State* v. *Marshall,* [supra, 601]. The defendants not only offered no such proof at trial but also failed to present such evidence at the hearing on their motions for a new trial, after they had had ample opportunity to conduct further investigation. Their speculation that such evidence might possibly have been discovered but for the failure to disclose the full police report at an earlier stage does not satisfy the *Bagley* materiality standard of undermining confidence in the outcome of the trial." *State* v. *John,* supra, 210 Conn. 669–71.

In September, 1990, the petitioner, pursuant to § 52-270 (a), brought the present amended petition for a new trial. In his petition, he claimed, inter alia, that there was new evidence that demonstrated that: (1) B was the likely perpetrator of the murder of the victim; and (2) the victim died after the petitioner had left Connecticut. After a full evidentiary hearing, the trial court denied the petition, and the petitioner timely requested permission to appeal pursuant to § 54-95 (a). The trial court denied that request. This appeal followed.

I

A

We first consider whether this court has subject matter jurisdiction to consider this appeal. The petitioner argues that the same reasoning that led us to conclude that we have subject matter jurisdiction to consider an

appeal from the denial of a petition for certification to appeal from a habeas court's decision; *Simms* v. *Warden*, 229 Conn. 178, 640 A.2d 601 (1994) (*Simms I*); should lead us to conclude that we also have jurisdiction over an appeal from the denial of a request for certification to appeal under § 54-95 (a). The state argues that, although we have held that we have subject matter jurisdiction to review denials of certification to appeal in the context of habeas corpus litigation, the lesser importance of a petition for a new trial, combined with the plain language of § 54-95 (a), requires us to conclude that we lack subject matter jurisdiction to review the denial of a petition for certification to appeal pursuant to § 54-95 (a). We agree with the petitioner and conclude that we have subject matter jurisdiction to hear this appeal.

We recently reaffirmed the "elementary rule of statutory construction [that when interpreting statutes] the intention which the legislature has expressed must govern." (Internal quotation marks omitted.) *Iovieno* v. *Commissioner of Correction*, 242 Conn. 689, 695, 699 A.2d 1003 (1997) (ten day time limitation for certification to appeal under General Statutes § 52-470 [b][7] not subject matter jurisdictional). "[L]egislative intent is to be determined by reference to the language of the statute, its legislative history and surrounding circumstances, the policy the limitation was intended to implement, and the statute's relationship to existing legislation and common law principles governing the same general subject matter. . . . [E]very presumption

---

[7] General Statutes § 52-470 (b) provides: "No appeal from the judgment rendered in a habeas corpus proceeding brought in order to obtain his release by or in behalf of one who has been convicted of crime may be taken unless the appellant, within ten days after the case is decided, petitions the judge before whom the case was tried or a judge of the Supreme Court or Appellate Court to certify that a question is involved in the decision which ought to be reviewed by the court having jurisdiction and the judge so certifies."

is to be indulged in favor of jurisdiction." (Citation omitted; internal quotation marks omitted.) Id.

We begin with the language of the statute. Section 54-95 (a) provides in relevant part: "No appeal may be taken from a judgment denying a petition for a new trial unless, within ten days after the judgment is rendered, the judge who heard the case or a judge of the Supreme Court or the Appellate Court, as the case may be, certifies that a question is involved in the decision which ought to be reviewed by the Supreme Court or by the Appellate Court. . . ." We first note that, although the language suggests stringent limitations on the right to appeal, the statute does not expressly bar or invalidate an appeal of a trial court's denial of certification, suggesting that the legislature may not have intended to bar such an appeal. See *Iovieno* v. *Commissioner of Correction*, supra, 242 Conn. 699 (" '[a] reliable guide in determining whether a statutory provision is directory or mandatory is whether the provision is accompanied by language that expressly invalidates any action taken after noncompliance with the provision' ").

In *Simms I*, supra, 229 Conn. 189, we considered the very similar language of § 52-470 (b), which provides in relevant part that "[n]o appeal from the judgment rendered in a habeas corpus proceeding . . . may be taken unless the appellant, within ten days after the case is decided, petitions the judge before whom the case was tried or a judge of the Supreme Court or Appellate Court to certify that a question is involved in the decision which ought to be reviewed . . . and the judge so certifies." We concluded that appellate review exists for a habeas petitioner denied a request for certification to appeal. *Simms I*, supra, 189. Applying the generally accepted maxim that " 'the legislature is always presumed to have created a harmonious and consistent body of law' "; id., 187; we reasoned that

permitting appellate review of the denial of certification under § 52-470 (b) was consistent with our overall statutory scheme in which certain statutes with certification requirements expressly preclude further appellate review in the absence of certification. Id.

Although the issue before us in *Simms I* was the availability of appellate review pursuant to § 52-470 (b), we discussed § 54-95 (a) as a statute that might similarly allow for appellate review, stating that, "[a]lthough §§ 52-470 (b) and 54-95 (a) both require certification to appeal, neither statute includes a provision that denial of the requisite certification is final and dispositive." *Simms I*, supra, 229 Conn. 188. We contrasted both of those statutes with General Statutes § 8-8,[8] which governs zoning appeals, and General Statutes § 51-197f,[9] which governs appeals from final judgments of the Appellate Court, in which "the legislature has expressly stated that, upon the denial of certification to appeal, there shall be 'no right to further review.'" *Simms I*, supra, 188. A comparison of these statutes led us to

[8] General Statutes § 8-8 provides in relevant part: "Appeal from board to court. Review by Appellate Court. . . . (o) There shall be no right to further review except to the Appellate Court by certification for review, on the vote of two judges of the Appellate Court so to certify and under such other rules as the judges of the Appellate Court establish. The procedure on appeal to the Appellate Court shall, except as otherwise provided herein, be in accordance with the procedures provided by rule or law for the appeal of judgments rendered by the Superior Court unless modified by rule of the judges of the Appellate Court. . . ."

[9] General Statutes § 51-197f provides: "Further review by certification only. Upon final determination of any appeal by the Appellate Court, there shall be no right to further review except the Supreme Court shall have the power to certify cases for its review upon petition by an aggrieved party or by the appellate panel which heard the matter and upon the vote of three justices of the Supreme Court so to certify and under such other rules as the justices of the Supreme Court shall establish. The procedure on appeal from the Appellate Court to the Supreme Court shall, except as otherwise provided, be in accordance with the procedure provided by rule or law for the appeal of judgments rendered by the Superior Court, unless modified by rule of the justices of the Supreme Court."

infer that had the legislature intended that there be no appellate review of the denial of certification to appeal pursuant to § 52-470 (b), the issue presented to us in *Simms I*, the legislature would have included the expressly limiting language as it has with other statutory provisions. Id., 187–88.

In *Simms* v. *Warden*, 230 Conn. 608, 613, 646 A.2d 126 (1994) (*Simms II*), we considered whether the restrictive language of § 52-470 (b) "was intended by the legislature as a limitation on the jurisdiction of the appellate tribunal or as a limitation on the scope of the review by the appellate tribunal," an issue we had addressed only indirectly in *Simms I*. We concluded "that the legislature intended the certification requirement only to define the scope of our review and not to limit the jurisdiction of the appellate tribunal." Id., 615. As we impliedly determined in *Simms I*, these inferences are equally applicable to the certification provision of § 54-95 (a).

Not only does the similarity in the language of §§ 52-470 (b) and 54-95 (a) suggest that we should treat similarly the denial of certification to appeal under either statute, the legislative history of the two statutes suggests the same conclusion. The requirements that petitioners obtain certification prior to appeals pursuant to §§ 52-470 and 54-95 were passed in close sequence to one another, on the same day in May, 1957. In describing the legislation that added the certification requirement to § 52-470, a sponsor of both bills, Senator John H. Filer, explicitly stated that his comments related to both of the proposed certification requirements because "[t]hey cover substantially the same subject." 7 S. Proc., Pt. 5, 1957 Sess., p. 2936. Moreover, Senator Filer subsequently reiterated, in commenting on the legislation that added the certification requirement to § 54-95, that he thought the earlier comments regarding

the legislation amending § 52-470 were "equally applicable" to the bill amending § 54-95. Id., p. 2944. This legislative history indicates that we should interpret § 54-95 (a) in the same fashion that we interpret § 52-470 (b) with respect to the issue of whether jurisdiction exists over appeals from a trial court's denial of certification to appeal.

Moreover, not only are the policy objectives underlying the certification requirements of both §§ 54-95 (a) and 52-470 (b) identical—namely, to discourage frivolous appeals[10]—the writ of habeas corpus and the new trial petition play similar, although not duplicative, roles in our overall statutory scheme. As recognized by this court, "[t]he principal purpose of the writ of habeas corpus is to serve as a bulwark against convictions that violate fundamental fairness." (Internal quotation marks omitted.) *Summerville* v. *Warden*, 229 Conn. 397, 419, 641 A.2d 1356 (1994). The opportunity for a new trial when new evidence comes to light provides a defendant an equally critical procedural mechanism for remedying an injustice. See id., 426–27 ("The three year statute of limitations[11] on a petition for a new trial based on newly discovered evidence is the product of the legislature's balancing of the interests of the petitioner against the interests of the public and the state. . . . Thus, for a petition for a new trial, within the three year limitations period, the petitioner's interests trump those of the public and the state." [Citations omitted; internal quotation marks omitted.]).

Furthermore, our interpretation of an analogous statute, General Statutes (Rev. to 1977) § 54-96, in *State* v.

---

[10] See 7 S. Proc., supra, pp. 2936–44, remarks of Senator Filer (indicating that certification requirements in §§ 54-95 and 52-470 were intended to serve same purpose, namely, "to reduce successive frivolous appeals in criminal matters and hasten ultimate justice").

[11] General Statutes § 52-582 provides: "Petition for new trial. No petition for a new trial in any civil or criminal proceeding shall be brought but within three years next after the rendition of the judgment or decree complained of."

*Avcollie,* 174 Conn. 100, 384 A.2d 315 (1977), further reinforces our conclusion that we have jurisdiction over a trial court's denial of certification to appeal pursuant to § 54-95. In *Avcollie,* we considered the requirement that the state, in order to appeal from a judgment in a criminal case, obtain permission from the trial court, pursuant to General Statutes (Rev. to 1977) § 54-96, which provided that "[a]ppeals from the rulings and decisions of the superior court, upon all questions of law arising on the trial of criminal cases, may be taken by the state, with the permission of the presiding judge, to the supreme court . . . ."[12] The question was whether that provision barred appellate review of the denial of a state's request to appeal. This court held that "[§] 54-96 does not . . . preclude an appeal by the state seeking review of the court's denial of permission to appeal in those unusual cases in which the state has properly and expeditiously expressed its intention to seek appeal at the time of judgment and the court's denial was so arbitrary as to constitute an extreme abuse of discretion rendering the denial ineffective." *State* v. *Avcollie,* supra, 110. This holding was reaffirmed in *State* v. *Bergin,* 214 Conn. 657, 660, 574 A.2d 164 (1990), where we reiterated that "[a]lthough we accord great deference to the trial court's discretionary rulings on these matters, that does not mean that its decision is shielded from our scrutiny."

Finally, there is no suggestion in the language of § 54-95 (a), its legislative history, or the policy upon which it is based, to indicate that § 54-95 (a) was meant to be interpreted in a manner contrary to the "strong presumption in favor of appellate jurisdiction . . . ." *Simms II,* supra, 230 Conn. 614; *Glastonbury Volunteer Ambulance Assn., Inc.* v. *Freedom of Information Commission,* 227 Conn. 848, 854, 633 A.2d 305 (1993);

---

[12] General Statutes § 54-96 presently provides that appeals may be taken "to the Supreme Court or to the Appellate Court . . . ."

*Ambroise* v. *William Raveis Real Estate, Inc.*, 226 Conn. 757, 765, 628 A.2d 1303 (1993). We see no reason, therefore, to disregard this well recognized presumption.

In light of the virtually identical wording of the statutory provisions governing appeals pursuant to §§ 54-95 (a) and 52-470 (b), the fact that the legislature did not, as it has in other contexts, expressly prohibit appellate review of the denial of certification to appeal, the recognized value of both provisions in remedying injustice, our previous determination that other statutes with similar certification requirements do not bar appellate jurisdiction, and the long recognized presumption in favor of appellate jurisdiction, we decline the state's invitation to distinguish between the appellate review available pursuant to §§ 52-470 (b) and 54-95 (a). Rather, we conclude, as in *Simms II*, supra, 230 Conn. 615, "that the legislature intended the certification requirement only to define the scope of our review and not to limit the jurisdiction of the appellate tribunal." Accordingly, we hold that a petitioner is entitled to appellate review of a trial court's denial of certification to appeal pursuant to § 54-95 (a).

B

Having decided that this court has jurisdiction to consider an appeal from the denial of a request for certification to appeal pursuant to § 54-95 (a), we next address the appropriate scope of review of that denial. The petitioner argues that we should review the denial of certification under § 54-95 (a) under the same standard that we use to examine the denial of certification under § 52-470 (b). We agree. The language of the two statutes is virtually identical, and the policy underlying each—to discourage frivolous appeals—is also identical. We therefore conclude that the same scope of

review applies to the denial of certification to appeal under each statute.

In *Simms II*, supra, 230 Conn. 616, we held that "in an appeal under § 52-470 (b), a petitioner will establish a clear abuse of discretion in the denial of a timely request for certification to appeal if he can demonstrate the existence of one of the *Lozada* criteria," thereby incorporating the framework adopted by the United States Supreme Court in *Lozada* v. *Deeds*, 498 U.S. 430, 431–32, 111 S. Ct. 860, 112 L. Ed. 2d 956 (1991), for analyzing the certificate of probable cause to appeal under the federal habeas corpus statute. According to the *Lozada* framework: "A petitioner satisfies that burden by demonstrating: [1] that the issues are debatable among jurists of reason; [2] that a court *could* resolve the issues [in a different manner]; or [3] that the questions are adequate to deserve encouragement to proceed further." (Emphasis in original; internal quotation marks omitted.) *Simms II*, supra, 616. Accordingly, we conclude that a petitioner can establish a clear abuse of discretion in a trial court's denial, pursuant to § 54-95 (a), of a timely request for certification to appeal a denial of a petition for a new trial by establishing one of the three *Lozada* criteria.

## II

We next consider whether, applying these principles to the present case, the trial court clearly abused its discretion in denying the petitioner's request for certification to appeal its denial of the petition for a new trial. We conclude that it did not.

The petitioner claims that the trial court's denial of his request for certification to appeal constitutes an abuse of discretion because three issues warranted appellate consideration.[13] The first two issues concern

[13] The petitioner stated the issues as follows: "(1) Should this petition for a new trial have been granted and did the trial judge abuse his discretion

whether the trial court improperly denied the petition for a new trial in light of: (1) allegedly newly discovered forensic entomological evidence; and (2) allegedly newly discovered evidence regarding B's relationship to the victim and B's involvement in sexual activities with a married couple, "couple X," at the victim's house, and B's allegedly belligerent deportment while testifying at trial in the present proceedings. The third issue concerns discovery rulings by the trial court, *Stanley, J.*, in October, 1991, and the trial court, *Corrigan, J.*, in May, 1996, denying the petitioner's discovery request for certain information possessed by the police regarding the identity of couple X. The petitioner claims that this ruling constituted an abuse of discretion and deprived him of his constitutional right to present a defense.

## A

We first consider the petitioner's claims regarding the first two issues. We consider these issues, as did the trial court, in light of the well established "standard

by denying the certification to appeal where the newly discovered evidence regarding B, coupled with B's testimony at this proceeding establish B's truthfulness when he originally told police that he last saw the victim at a time when the petitioner had left the Waterford Connecticut area?

"(2) Should this petition for a new trial have been granted, and did the trial judge abuse his discretion by denying certification to appeal, when newly discovered evidence regarding couple X which was not disclosed until the start of the trial of this petition and which is still not fully disclosed, would probably, in conjunction with the newly discovered evidence regarding B, result in a different outcome to the trial of the petitioner, and the failure to disclose deprived the petitioner of his constitutional right to present a defense at trial?

"(3) Should this petition for a new trial have been granted and did the trial judge abuse his discretion by denying the certification to appeal, when newly discovered evidence establishes that the most likely time of death [of the victim] was after June 20, 1980, and that such newly discovered evidence would probably result in a different outcome at a new trial of the petitioner?" For purposes of clarity in reviewing the petitioner's claims, we have rephrased and reorganized the issues as described in the text of part II of this opinion.

that governs the granting of a petition for a new trial based on newly discovered evidence . . . . The petitioner must demonstrate, by a preponderance of the evidence, that: (1) the proffered evidence is newly discovered, such that it could not have been discovered earlier by the exercise of due diligence; (2) it would be material on a new trial; (3) it is not merely cumulative; and (4) it is likely to produce a different result in a new trial." *Asherman* v. *State*, 202 Conn. 429, 434, 521 A.2d 578 (1987). The trial court in the present case found that the petitioner had not established *any one* of these four essential requirements for obtaining a new trial. Our exhaustive review of the record convinces us not only that the trial court did not abuse its discretion in doing so, but also that no jurist of reason would have concluded otherwise, that the trial court could not have concluded otherwise, and that there are no questions raised by the record in this case that are adequate to deserve further encouragement.

The petitioner claimed in the trial court that there was newly discovered evidence regarding, generally, developments in the field of forensic entomology, and specifically, alleged changes in the opinion of Lord, who had testified as a witness for the state in the original trial. As the present trial court stated, "[t]he focus of [the petitioner's] claim as newly discovered evidence is that Lord's testimony at the [criminal] trial was crucial in establishing the time of death of [the victim] to be late morning or early afternoon of Friday, June 20, 1980, [that is, before the petitioner had left the Waterford area], but, since that testimony in 1986, he has given [an] opinion in subsequent homicide cases which differs entomologically" from the opinion expressed in that testimony.

In support of this assertion, the petitioner offered in evidence two depositions of Lord, taken on September 7, 1990, and on June 9, 1992. "The [petitioner] also

offered the testimony of William Kriniski through whom two scientific papers were introduced into evidence, one of which was the 'Nocturnal Oviposition Behavior of Blow Flies' by Bernard Greenberg published in 1990." In that article, Greenberg reports observing nocturnal oviposition, or laying of eggs, by blow flies. B. Greenberg, "Nocturnal Oviposition Behavior of Blow Flies," 27 J. Med. Entomol. 797, 808 (1990). The trial court stated: "Kriniski, Greenberg and Lord, all entomologists, testified at the petitioner's criminal trial. Kriniski and Greenberg testified at the trial that in their opinion, from analysis of the stage of larvae on the [victim's] body, death could not have occurred before Saturday, June 21, 1980. Their opinions were based on their belief that nocturnal oviposition does occur. The [petitioner] did not offer [the testimony of Kriniski and the scientific papers introduced through him] simply to bolster Kriniski and Greenberg's opinion [expressed at the criminal trial] but [also] to show that in Lord's deposition of June 9, 1992, he did not dispute Greenberg's observation of such nocturnal oviposition." Thus, the petitioner claimed that Lord's deposition response, when asked about Greenberg's study, constituted new evidence that Lord had now adopted Greenberg's opinion.

The trial court found, however, that the petitioner's evidence did not indicate any material change in Lord's opinion. Contrary to the petitioner's contention, the trial court found that Lord still *disagreed* with Greenberg. The court noted that, when asked about Greenberg's study at his deposition, Lord sardonically commented, "if Greenberg said he saw oviposition at night, he believed it," and that Lord further testified that no other scientist has been able to duplicate such observations and that another prominent entomologist has found to the contrary. Moreover, the court found that, contrary to the petitioner's claim, Lord testified

in both depositions that he has not changed the opinions that he rendered in the petitioner's criminal trial. The court also found that Lord has not changed his methodology in determining the time of death, noting that "[h]e testified that he still uses the same behavioral information [regarding] the flies found on the dead body with concern for the environmental conditions which had been present . . . ."

On the basis of these findings, the trial court concluded that the petitioner had failed to offer any new entomological evidence. Rather, in the court's view, insofar as the evidence indicated that the opinions of Lord, Greenberg and Kriniski had not changed, the evidence was essentially the same as, and cumulative to, the evidence offered at the criminal trial. In addition, the court concluded that "Lord's opinion given in 1986 . . . was not, as [the petitioner claims], crucial in establishing the time of death. Even if Lord had joined in the opinions shared by Kriniski and Greenberg, the joinder would not have excluded Friday [June 20, 1980] as the date of [the victim's] death in light of the other evidence produced in the criminal trial." Furthermore, the trial court concluded that, even if evidence of a hypothetical change of opinion by Lord were considered in conjunction with the petitioner's other alleged new evidence regarding the activities of B and couple X—which we examine next—"weighed against the evidence presented in the original trial," the result of the trial was not likely to be different.

We have reviewed fully the record regarding this issue. There is nothing in the record to suggest that the trial court's findings and conclusions are debatable among jurists of reason, that a court could have resolved this claim in a different manner, or that there are any questions that deserve further proceedings. Therefore,

we conclude that the trial court did not abuse its discretion in denying certification to appeal with respect to this issue.

The petitioner's second claim was based upon allegedly newly discovered evidence regarding B's relationship to the victim, B's involvement in sexual activities with couple X at the victim's house, and B's allegedly belligerent deportment while testifying at the present trial. This evidence was presented mainly through the testimony of Detective McCarthy and B.[14]

The substance of McCarthy's testimony concerning his contact with B was essentially the same as the contents of his July 8, 1980 report based on his interview with B at that time, and a subsequent report based on an interview with B on June 7, 1985. Portions of the first report and the entire contents of the second report had been disclosed to the petitioner prior to his criminal trial, and the remainder of the July 8, 1980 report was disclosed after the trial, when it then became the subject of the petitioner's unsuccessful motion for a new trial and the basis for a number of unsuccessful claims on appeal. See *State* v. *John,* supra, 210 Conn. 655–56, 666–71.

The substance of McCarthy's testimony regarding B involved B's relationship with, and his last contacts with the victim.[15] McCarthy also testified concerning

---

[11] The petitioner also presented M as a witness. The petitioner, has not provided us with a transcript of M's testimony, however, and his claims do not pertain to that testimony.

[15] The petitioner gave the following summary of McCarthy's testimony in his brief to this court: "According to McCarthy, B indicated [at the July 8, 1980 interview] that he had known [the victim] for most of his life; that [the victim] was a family friend and that he had been to [the victim's] home many times. He further told McCarthy that he was last with [the victim] on Friday, June 20, 1980, between 3:30 and 3:45 p.m., when he saw [the victim] walking . . . and gave him a ride to his home . . . ." B also indicated that the victim did not mention that his car was missing, and that the only conversation he remembered concerned a recent tennis match in France.

his contact with couple X.[16] B testified that the victim had never made any sexual advances to him, and he denied telling McCarthy otherwise. B denied telling McCarthy that the sexual encounter with couple X in the victim's home took place on any specific date, and he maintained that, in fact, it took place in 1979. B also denied ever providing a date to McCarthy regarding his last contact with the victim. In the estimation of the petitioner, B's manner was belligerent throughout his testimony.

The petitioner claimed in the trial court, in the present proceedings, that the evidence of B's sexual contact

In addition, "[a]ccording to McCarthy, B told him that he was aware of [the victim's] homosexual tendencies. He remembered an incident which took place about eight years earlier when [the victim] made homosexual advances toward him. . . . B [also] acknowledged that [a] photograph [in McCarthy's possession] showed B in [the victim's] home [in casual clothing, fully attired], and that such photograph was taken at night in early to mid-June of 1980. B went on to tell McCarthy that he had been sexually involved with a married couple at [the victim's] home during the first part of June, 1980; that his sexual involvement was arranged by [the victim], and that B had sex with the woman in the presence of the man. B further told McCarthy that no sexual demands were made of him by [the victim]." McCarthy also testified that at the time of his July 8, 1980 interview with B, he believed that the time of the death of the victim had been June 22 or 23, 1980.

McCarthy further testified that during his 1985 interview with B, B had informed him that he was uncertain of the precise date on which he gave the victim a ride, and that he believed that the tennis competition that he and the victim had discussed had been ongoing at the time. McCarthy stated that his research indicated that the French Open took place between May 29 and June 6, 1980. McCarthy further indicated that at that time he believed the time of death was most likely June 20, that the petitioner and John were the primary suspects, and that B was not considered a suspect at that time.

[16] McCarthy testified that he had interviewed couple X on July 3, 1980, and on at least three other occasions. He stated that they had told him that: they had a single sexual encounter with B at the victim's home, in which B engaged in sexual activities with Mrs. X while Mr. X observed, approximately four weeks prior to the murder of the victim; the victim had arranged this encounter for them, but that he was not present during it; they had had a similar sexual contact, also arranged by the victim, with M, approximately one year before the murder, and possibly two other such encounters with different people prior to that; and no money or compensation was exchanged

with couple X and the fact that the victim had arranged it, and McCarthy's testimony that B initially told McCarthy that B gave the victim a ride in B's car around 3:30 p.m. on June 20, 1980, constituted evidence of both motive and opportunity on the part of B to commit the murder. The petitioner claimed further that, had he presented that evidence to the jury, the jury would have believed that B, instead of the petitioner, had committed the murder, or, at the least, the jury would have believed that B actually did see the victim at 3:30 p.m. on June 20, notwithstanding McCarthy's testimony regarding B's statement in 1985 that he was unsure of that date. The petitioner claimed the jury would have believed that B's alleged 1980 statement to McCarthy reflected the truth, and disbelieved the alleged 1985 statement, because McCarthy's belief in 1985 that death had occurred on June 20, would have given B concern that his earlier statement rendered him a primary suspect, thereby providing him a motive to change his story. Although the petitioner presented no evidence that B believed that he was a suspect, the petitioner asserted that a jury was likely to conclude that he so believed. The petitioner also claimed that the likelihood of a reaction by the jury along these lines was increased by B's belligerent deportment during his testimony. If the jury believed that B actually saw the victim at 3:30 p.m. on June 20, the petitioner claimed, they would have acquitted him of the murder charge because the other evidence at the criminal trial conclusively established that the petitioner and John were no longer in the Waterford area at that time.

The trial court rejected these claims. First, citing *State* v. *Giguere*, supra, 184 Conn. 405, and *State* v. *Marshall*, supra, 166 Conn. 601, the court concluded that, at a new trial, the evidence of B's arranged sexual

in regard to these arrangements. McCarthy also testified that couple X had told him that they and the victim had eaten lunch together on June 19, 1980.

encounter would not be admissible as evidence of a third party's guilt of the murder because the petitioner had failed to provide any evidence directly linking B with the crime. The court rejected as mere speculation the petitioner's assertion that the evidence regarding the sexual encounter constituted evidence of motive to commit the murder. Moreover, citing our decision on the appeal in the petitioner's criminal case; *State* v. *John,* supra, 210 Conn. 671; where we confirmed the rejection by the trial court in the criminal proceedings and the first new trial motion of essentially these same claims, the trial court, in the present proceedings, concluded that this evidence was not new, but rather, merely cumulative.

Moreover, the trial court concluded that, even assuming the petitioner *had* established the first three requirements for granting a new trial—which, the trial court found, he had not—he had failed to establish the fourth requirement, namely, that the purported new evidence was likely to produce a different result. First, the trial court rejected the petitioner's claims regarding the inferences that the evidence would support in the minds of a fact finder. Regarding B's truculent deportment, the trial court stated: "It is natural for people to be unfriendly to others who wish to expose to the public their private activities." Regarding the petitioner's claim that B's 1980 statement that B had given the victim a ride at 3:30 p.m. on June 20, 1980, indicated that B was the murderer, and that he lied in 1985 when he stated that he was uncertain of the date in order to distance himself from the murder, the court stated: "It is common for the perpetrator of a crime to distance himself from the scene thereof, and if B had known that the crime was committed on June 20, it would be folly to have acknowledged giving [the victim] a ride on that very day."

In addition, the trial court concluded that, when "weighed against the evidence presented in the original trial, [this evidence was] not likely to produce a different result." The court indicated that this would be so, even if the evidence regarding B was considered in conjunction with the petitioner's entomological evidence, and even if that entomological evidence had indicated that Lord had changed his opinion. In support of this conclusion, the trial court noted the following: (1) when he was discovered with a "depressed skull fracture with laceration of the brain, caused by an object such as the corner of a brick," the victim's "right front pants pocket was inside out and empty, the pocket in which it was known he kept his keys"; (2) the petitioner was at the home of an acquaintance when the petitioner "stated he was leaving town and he knew where he could get a car from a seventy year old queer in Waterford"; (3) early on the afternoon of June 20, 1980, the petitioner had visited his parents, told them he was leaving the state, and had driven away in an old green automobile; (4) at 5:15 p.m. on June 20, 1980, the victim's old green Buick was found abandoned, out of gas, in Brewster, New York, which is approximately two and one-half hours from Waterford; (5) the petitioner's fingerprints were found in the car, and the victim's house and car keys were found on the ground nearby; (6) on June 24, 1980, the petitioner told the person who picked up him and John in Ohio, that they had "gotten a car from an old man who lived out in the woods," and that the car had not been stolen "because the guy who owned it was dead"; (7) M spoke to the victim at noon on June 20, 1980, and the victim told him he could not speak then but would call him back in thirty minutes; (8) the victim never returned the call, and M tried to call him several times between noon and 1 p.m. on June 20, and several additional times over the weekend; (9) the police found Friday's mail in the victim's mailbox when

they discovered his body on June 24, even though the victim typically retrieved his mail promptly; (10) in the front yard of the victim's home, where evidence indicated a struggle had occurred, the police discovered a copper bracelet that a friend of the petitioner's said looked very similar to one that he had given the petitioner several weeks before; (11) an old friend of the victim recalled passing his house three times during the week ending June 21, 1980, and on one occasion saw "two young men dragging something heavy toward the back of the house"; (12) the chief medical examiner and assistant medical examiner were of the opinion that the victim had died two to four days before the body was discovered on June 24, 1980; and (13) Lord was of the opinion, both during the original trial and during his later depositions, that the victim had died sometime between the late afternoon of June 19, 1980, and June 21, 1980.

We have reviewed fully the record regarding this issue. There is nothing in the record to suggest that the trial court's findings and conclusions are debatable among jurists of reason, that a court could have resolved this claim in a different manner, or that there are any questions that deserve further proceedings. The trial court did not abuse its discretion in denying certification to appeal with respect to this issue.

## B

The petitioner also claims that the trial court's denial of his request for certification to appeal constituted an abuse of discretion because certain discovery rulings by Judge Stanley in October, 1991, and by Judge Corrigan in May, 1996, warrant appellate review. The first ruling denied without prejudice the petitioner's discovery request for information possessed by the police regarding the identity of couple X and the information regarding police investigative interviews with couple

X, and the second ruling denied his renewed request for this same information during the trial on his petition. The petitioner claims that this ruling constituted an abuse of discretion and deprived him of his constitutional right to present a defense.[17] We reject the petitioner's claims.

First, the petitioner's claim that he has been denied his constitutional right to present a defense is without merit. As the petitioner has acknowledged in his brief to this court, "[a] petition for a new trial is a civil action . . . ." In this civil action, the petitioner is just that, a petitioner, and, therefore, in the trial court *he* bore the burden of proving, by a preponderance of the evidence, that newly discovered evidence warranted the granting of a new trial. *Asherman* v. *State*, supra, 202 Conn. 434. He is not a criminal defendant in these proceedings, and he did not present a defense in the trial court. Thus, his claim that his constitutional right to present a defense was violated by the trial court's discovery rulings is simply inapt. Cf. *Summerville* v. *Warden*, supra, 229 Conn. 422 ("a collateral attack on a conviction . . . cannot rely on the presumption of innocence because that presumption does not survive a judgment of conviction").

Moreover, the petitioner has not demonstrated that the trial court abused its discretion in rejecting his discovery requests. The state argues that this information was protected by a qualified law enforcement privilege that this court has long recognized. See *State* v.

---

[17] "The sixth amendment to the United States constitution provides in relevant part that [i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor . . . . This right is applied to the states under the due process clause of the fourteenth amendment to the United States constitution. *Washington* v. *Texas*, 388 U.S. 14, 18, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967); see *State* v. *McKnight*, 191 Conn. 564, 580–81, 469 A.2d 397 (1983)." (Internal quotation marks omitted.) *State* v. *Bova*, 240 Conn. 210, 235 n.13, 690 A.2d 1370 (1997).

*Zimnaruk*, 128 Conn. 124, 127, 20 A.2d 613 (1941) ("[i]nformation disclosed to a state's attorney for the purpose of enabling him to perform the duties of the office is privileged upon grounds of public policy, and an adverse party has no right to demand its production"). As the state notes, the reason for this privilege is to aid the state's attorney and the police in conducting investigations by encouraging people to disclose information without fear of embarrassment through subsequent, needless public disclosure. Although this privilege, of course, yields to the state's obligation to disclose information that is exculpatory, the petitioner has provided *no* evidence suggesting that the identity of couple X, or any police reports regarding interviews with them, would be exculpatory—notwithstanding his extensive examination of McCarthy in the trial court proceedings regarding his interviews with couple X, and notwithstanding the state's voluntary disclosure of McCarthy's report based on his July 3, 1980 interview with them. As the state claimed in its brief to this court: "There is no evidence that couple X had any contact with the victim after lunch on June 19, 1980. The victim was alive when he talked to the veterinarian at about 10 a.m. on the morning of June 20, and still alive when he spoke to M at noon on June 20. *State* v. *John*, supra, 210 Conn. 656. There is no evidence that couple X's [long] relationship with the victim was anything less than amicable, and there is no evidence connecting them with the crime either as witnesses or perpetrators."

Beyond his insistence that the state's information about couple X would somehow be exculpatory, the petitioner has offered no response to the state's assertion of its qualified law enforcement privilege. Our review of the record in the present case has not revealed anything to suggest that these discovery rulings are debatable among jurists of reason, that a court could

have resolved the discovery requests in a different manner, or that there are any questions in regard to those rulings that deserve further proceedings. We conclude, therefore, that the trial court did not abuse its discretion in denying certification to appeal with respect to this issue.

The appeal is dismissed.

In this opinion the other justices concurred.